1  DAVIS WRIGHT TREMAINE LLP
   KELLI L. SAGER (State Bar No. 120162)
2      kellisager@dwt.com
   ALONZO WICKERS IV (State Bar No. 169454)
3      alonzowickers@dwt.com
   LISA J. KOHN (State Bar No. 260236)
4      lisakohn@dwt.com
   865 South Figueroa Street, Suite 2400
5  Los Angeles, California 90017-2566
   Telephone:  (213) 633-6800 / Fax:  (213) 633-6899
6
   LOS ANGELES TIMES COMMUNICATIONS LLC
7  KARLENE GOLLER (State Bar No. 147065)
       karlenegoller@latimes.com
8  202 West First Street
   Los Angeles, California  90012
9  Telephone:  (213) 237-3760 / Fax:  (213) 237-3810

10 Attorneys for Defendants MICHAEL HILTZIK,
   STUART PFEIFER, and LOS ANGELES TIMES
11 COMMUNICATIONS LLC

12              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
13                    WESTERN DIVISION

| | |
|---|---|
| 14  1 800 GET THIN, LLC, | ) Case No. 2:11-CV-0505-ODW (Ex) |
| 15              Plaintiff, | ) Assigned to the<br>) Honorable Otis D. Wright II |
| 16        vs. | ) |
| Michael Hiltzik, an individual; Los Angeles | ) |
| 16 Times Communications, LLC; Stuart Pfeifer, | ) **RESPONSE TO PLAINTIFF'S** |
| 17 an individual; SNAPSHOTS, an individual; | ) **FALSE AND INADMISSIBLE** |
| Adrian_Dallas, an individual; jkrischel, an | ) **STATEMENTS IN** |
| 18 individual; neoserf, an individual; paulmayer, | ) **OPPOSITION TO EX PARTE** |
| an individual; dalefogden, an individual; | ) **APPLICATION;** |
| 19 wtharvey, an individual; matt_powers, an | ) **SUPPLEMENTAL** |
| individual; callcenterjohnny, an individual; | ) **DECLARATION OF KELLI L.** |
| 20 Ebuckly, an individual; bigsouthern, an | ) **SAGER WITH EXHIBIT I;** |
| individual; OCChick, an individual; | ) **DECLARATION OF KARLENE** |
| 21 AllenGillespie, an individual; dhaettig, an | ) **GOLLER** |
| individual; Baseballhead, an individual; | ) |
| 22 mattemons, an individual; JulyPostOp, an | ) |
| individual; DrBruin2, an individual; | ) Action Filed:  January 18, 2011 |
| 23 RUJoking?!, an individual; InstructorP, an | ) |
| individual; 1Friend, an individual; darmaggi, | ) |
| 24 an individual; RamonaInCorona, an | ) |
| individual; dianne.m.daniels, an individual; | ) |
| 25 LAX.Prepster, an individual; Isabellel 106, | ) |
| an individual; AlanSmythl, an individual; Ed | ) |
| 26 Wood, an individual; | ) |
| KatherineLicariVenturoso, an individual; | ) |
| 27 Does 1-10, inclusive, | ) |
| 28              Defendants. | ) |

                              1

RESPONSE TO PLAINTIFF'S OPPOSITION TO EX PARTE APPLICATION
DWT 17552033v1 0026175-000388

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

1  |  Attached are the Supplemental Declaration of Kelli L. Sager and the
2  |  Declaration of Karlene Goller, which are necessitated by the false declarations filed
3  |  by plaintiff's counsel in response to the pending <u>Ex</u> <u>Parte</u> Application.[1]  For the
4  |  reasons set forth in the Application, and the attached documents, this Court is
5  |  requested to grant the relief sought, and sanction plaintiff's counsel.

6

7  |  DATED:  July 7, 2011          DAVIS WRIGHT TREMAINE LLP
                                    KELLI L. SAGER
8                                   ALONZO WICKERS IV
                                    LISA J. KOHN
9

10                                  LOS ANGELES TIMES COMMUNICATIONS LLC
                                    KARLENE GOLLER
11

12

13                                  By: _____ /s/ Kelli L. Sager _____
                                                  Kelli L. Sager
14

15                                  Attorneys for Defendants MICHAEL HILTZIK,
                                    STUART PFEIFER, and LOS ANGELES TIMES
16                                  COMMUNICATIONS LLC

17

18

19

20

21

22

23

24  |  _____
25  |      [1] Both the Declarations of Robert Silverman and Brian Oxman are replete
       with inadmissible hearsay, legal conclusions, and speculation.  (Among other
26     things, Mr. Silverman's assertions about what Mr. Oxman "heard" (Silverman Decl.
       at ¶ 5) are not based on personal knowledge, and can only be based on inadmissible
27     hearsay.)  Moreover, the Oxman declaration is not made under penalty of perjury
       under the laws of the United States.
28

RESPONSE TO PLAINTIFF'S OPPOSITION TO EX PARTE APPLICATION
DWT 17552033v1 0026175-000388

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

# DECLARATION OF KELLI L. SAGER

## DECLARATION OF KELLI L. SAGER

I, Kelli L. Sager, declare:

1.     I am an attorney admitted to practice before all the courts of the State of California and before this Court.  I am a partner in the law firm of Davis Wright Tremaine LLP ("DWT"), and I am one of the attorneys representing defendants Los Angeles Times Communications LLC, Michael Hiltzik, and Stuart Pfeifer (collectively, the "Times Defendants") in this matter.  The facts stated below are true of my own personal knowledge, and, if called to testify, I could and would competently testify to these facts.

2.     On July 6, 2011, at approximately 5:05 p.m., counsel for plaintiff filed an Opposition to the Ex Parte Application filed by our office at approximately 12:00 noon on July 5.  With the Opposition are two declarations from plaintiff's counsel Robert Silverman and his associate, Brian Oxman, that contain additional false and misleading statements purporting to address the failure of plaintiff's counsel to "meet and confer" about their Motion To Amend, as required by Local Rule 7-3.

3.     The Opposition refers to "emails" between Mr. Silverman and myself. The only "emails" sent by Mr. Silverman to me concerning an intent to seek leave to amend the complaint in this action before the Motion To Amend was filed are the ones attached to the Times defendants' Application.  Nothing in the emails from Mr. Silverman disclosed any information about the bases or substance of the Motion to Amend.

4.     The Opposition brief also refers to two "in-person" meetings, and suggests that these "meetings" had something to do with this case.  That suggestion is false.  The first "meeting" referred to was not a "meeting" at all; it was a hearing on the Times defendants' motion to strike a defamation lawsuit filed by Michael Omidi, which took place on June 27, 2011.  Nothing was said before, during, or after that hearing about this pending federal lawsuit, nor did Mr. Silverman make

DECLARATION OF KELLI L. SAGER
DWT 17532308v1 0026175-000388

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

any mention of his intent to file a Motion To Amend.  He immediately left the courtroom after Judge Michael C. Solner granted the Motion To Strike, and did not engage in any conversation whatsoever with me or with Karlene Goller, who was at the hearing.

5.     On June 29, 2011, the second "meeting" referred to in plaintiff's Opposition, also was not a "meeting" – it was a hearing on the Times defendants' motion to strike a defamation lawsuit filed by Julian Omidi.  Contrary to the assertion of Mr. Silverman and Mr. Oxman, there was nothing said at that hearing, or afterwards, about this federal lawsuit, nor was there <u>any</u> mention made of Mr. Silverman's intent to file a Motion To Amend.  (In fact, Mr. Oxman was late to the hearing, requiring that our matter be placed on second call.  Mr. Silverman, Ms. Goller and I were all in the courtroom during the court's recess, while we waited for Mr. Oxman to show up, but Mr. Silverman did not speak to Ms. Goller or me at all, let alone raise the subject of meeting and conferring on a motion to amend.)  After the hearing on our motion to strike concluded, there was no conversation <u>at all</u> between me and Mr. Silverman or Mr. Oxman – none.  <u>Nothing</u> was said by either of them about the federal lawsuit, nor was there any mention of a motion to amend in the federal action.

6.     More specifically:  The statement by Mr. Oxman that I "stated that [I] did not wish to further discuss any of the pending matters in the federal court proceedings" is wholly fabricated.  His statement that I "refused any discussion" about the federal action is wholly fabricated.  And his statement that Mr. Silverman "asked [me] if they could resolve the Amendment [sic] Complaint in the federal case" not only is unintelligible, it is wholly fabricated.

7.     Notably, the email sent to me by Mr. Silverman at 2:10 p.m. on July 6 <u>does not mention</u> the purported "conversation" that Mr. Silverman and Mr. Oxman now claim happened.  Instead, Mr. Silverman's email makes clear that there was never any disclosure of the substance of the pending Motion To Amend, nor any

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

attempt made to meet-and-confer beyond the deliberately vague emails sent the first week of June.

8. Even Mr. Silverman's false claim that he "asked" if we could "resolve the motion to amend in the federal court" lacks credibility, given his simultaneous claim that he does not recall receiving any response. The reason he does not "recall" a response is because there was no response; I never heard any question from Mr. Silverman about the federal case. Nor would it constitute a "meet and confer" even if he had "asked" if we could "resolve" a motion to amend – which he did not – given his tacit admission that he never provided any basis for such a motion or any detail about what it would contain.

9. Mr. Silverman's email today also makes clear that his conduct in filing his Motion on the Friday night before a holiday weekend was deliberate, and was retaliation for his claim that we refused to agree to a briefing schedule on the motion to dismiss filed by the Times defendants. (That assertion also misrepresents the facts, which I am happy to relate to the Court, but which are irrelevant to the issue at hand.)

10. Mr. Silverman's email from July 6 complains that I have "attempt[ed] to place Mr. Oxman in a bad light …." He is referring to an inquiry I made at the hearing on July 29, where Mr. Oxman appeared for the first time as counsel in that case (without any prior notice), and asked to argue the motion on behalf of Julian Omidi. Upon learning of Mr. Oxman's intent to appear, I inquired on the record whether Mr. Oxman was currently in good standing as a member of the Bar, since I was aware that the State Bar Court recommended several months ago that he be suspended from the practice of law for misconduct. Because I did not know in advance that Mr. Oxman was going to appear at the July 29 hearing, I did not have an opportunity to check beforehand to determine whether the California Supreme Court has acted on the State Bar's recommendation. (I am informed and believe that the matter is still pending.) The State Bar Court refers to Mr. Oxman's "lack of

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

candor" and "lack of honesty" during his testimony before the Court in relating its recommendation of discipline. (A true and correct copy of the March 3, 2011 Order is attached as Exhibit I.)

11. Plaintiff's Opposition also claims several times that I did not "ask" Mr. Silverman about the substance of the motion to amend. As the emails attached to the Ex Parte Application make clear, that is false. I did ask, but Mr. Silverman did not respond. When days, then weeks passed without any filing of the threatened ex parte application, I concluded that he had decided not to seek leave to amend. Mr. Silverman never mentioned a request to amend the federal complaint again, nor did he tell me that instead of an ex parte application, he had instead decided to wait a month and then file a noticed Motion on minimum notice, without complying with this Court's rules.

12. Mr. Silverman's ridiculous assertions about the request for continuance being related in some convoluted way to bankruptcy proceedings involving the Times is also entirely false (and makes no sense, given that the filing of the Motion To Amend is already a matter of public record, and has no bearing on the bankruptcy proceedings in any event). While it is now apparent that Mr. Silverman and his co-counsel, Brian Oxman, will go to any lengths to try to keep this lawsuit alive, their declarations do not change the facts set forth in the Times defendants' Ex Parte Application.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct, and that this Declaration was executed on the 7th day of July, 2011, in Los Angeles, California.


                                        /s/ Kelli L. Sager
                                        Kelli L. Sager

DECLARATION OF KELLI L. SAGER
DWT 17532308v1 0026175-000388

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

# EXHIBIT I

FILED MARCH 3, 2011

## STATE BAR COURT OF CALIFORNIA

## HEARING DEPARTMENT – LOS ANGELES

| | |
|---|---|
| In the Matter of | ) **Case Nos.: 07-O-11968-DFM** |
| **RICKEY BRIAN OXMAN,** | ) (08-O-12328); 07-O-13696 |
| **No. 72172,** | ) (09-O-12276) (Cons.) |
| and | ) |
| **MAUREEN PATRICIA JAROSCAK** | ) **DECISION** |
| **No. 117677** | ) |
| Members of the State Bar. | ) |

## INTRODUCTION

Respondents Rickey Brian Oxman (Respondent Oxman) and Maureen Patricia Jaroscak (Respondent Jaroscak) are husband and wife and long-time law partners. There are eight counts included in the Notice of Disciplinary Charges filed by the State Bar against them in this proceeding. Three of the counts are against only Respondent Oxman; three are against only Respondent Jaroscak; the remaining two counts are brought jointly against both respondents.

Respondent Oxman is charged here individually with willfully violating: (1) section 6068, subdivision (o)(3) of the Business and Professions Code[1] (failure to report judicial sanctions); and (2) section 6068, subdivision (i) (failure to cooperate with a State Bar investigation). A third count, of violating section 6103 (failure to obey court order), was alleged in the NDC but was dismissed at the request of the parties during the trial.

---

[1] Unless otherwise noted, all future references to section(s) will be to the Business and Professions Code.

Respondent Jaroscak is charged individually with willfully violating: (1) section 6106 (moral turpitude-breach of fiduciary duty); and (2) section 6068, subdivision (i) (failure to cooperate with a State Bar investigation) [two counts].

The remaining two charges were brought against both respondents. In these counts, they are charged jointly with willfully violating: (1) rule 4-100(A) of the Rules of Professional Conduct[2] (commingling personal funds in a client trust account); and (2) section 6106 (moral turpitude - dishonesty).

The court finds culpability and recommends discipline as set forth below.

## PERTINENT PROCEDURAL HISTORY

The Notice of Disciplinary Charges (NDC) was filed in this matter by the State Bar of California on May 10, 2010. On June 25, 2010, Respondent Oxman filed his response to the NDC. On July 7, 2010, Respondent Jaroscak filed her response to the NDC.

On June 9, 2010, an initial status conference was held in the matter at which time the case was ordered to commence trial on November 2, 2010.

Trial was commenced and completed as scheduled. The State Bar was represented at trial by Deputy Trial Counsel Agustin Hernandez and Jessica Lienau. Respondent Oxman was represented at trial by David Clare. Respondent Jaroscak was represented at trial by Susan Margolis.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Jurisdiction

Respondent Oxman was admitted to the practice of law in California on December 22, 1976, and has been a member of the State Bar at all relevant times.

---

[2] Unless otherwise noted, all future references to rule(s) will be to the Rules of Professional Conduct.

Respondent Jaroscak was admitted to the practice of law in California on June 11, 1985, and has been a member of the State Bar at all relevant times.

**Case No. 07-O-11968**
*[Oxman only]*

Respondent Oxman represented Raquel Axelrod ("Axelrod"), formerly Raquel Larson, in a marital dissolution proceeding in the Los Angeles Superior Court titled *Raquel Larson v. Christopher Larson*, case number BD 267034 ("the marital dissolution proceeding"). Christopher Larson ("Larson") was represented by attorney John R. Fuchs ("Fuchs") in the proceeding.

On December 22, 2004, Axelrod filed a bankruptcy petition under chapter 7 in the United States Bankruptcy Court, Central District of California, titled *In re Raquel Axelrod*, case no. SV04-189053 ("the Axelrod bankruptcy proceedings"). In addition to other obligations, Axelrod sought to discharge claims made against her by Larson. Larson was represented by attorneys Fuchs and Gail S. Gilfillan ("Gilfillan") in that bankruptcy proceeding.

On April 25, 2005, Axelrod received a discharge of her dischargeable pre-petition debts other than the ones subject to non-dischargeable litigation. Although the non-dischargeability litigation continued, the main case was closed when the chapter 7 trustee concluded her administration of the case.

Thereafter, on September 6, 2006, Axelrod filed a motion to reopen the main bankruptcy case in order to obtain an order approving a compromise between Axelrod and Larson settling all of the litigation between them. On September 20, 2006, Respondent Oxman and his law firm filed an objection to the compromise, alleging a right to be paid some part of the compromise monies on a theory of equitable subrogation. This subrogation claim was based on the fact that Respondent Oxman and Axelrod had previously been jointly sanctioned in another proceeding in the amount of $29,535.64. Respondent Oxman and his law firm had paid the entire amount of

-3-

the sanction.  Respondent Oxman requested the bankruptcy court to stay the settlement payment to permit him to file an adversary proceeding to determine his equitable subrogation rights and rights to receive payment by operation of law.

Larson filed an opposition to this objection by Respondent Oxman, and made a request for sanctions of $5,084 on the grounds that the objections were frivolous and made for improper purposes.  Respondent Oxman thereafter filed a reply brief in support of his objections.

The matter came on for hearing on October 24, 2006.  Oxman's objections to the compromise were overruled, and the compromise was approved by an order entered by the court on November 7, 2006.

On October 30, 2006, Gilfillan brought a Motion for Sanctions against Respondent Oxman on behalf of Larson, contending that Respondent Oxman's Objection to Motion for Approval of Controversy was factually and legally meritless and was filed in bad faith in an effort to harass Larson.  On November 22, 2006, Respondent Oxman filed a Memorandum in Opposition to Larson's Motion for Sanctions as well as an Objection to the Declarations of Gilfillan and Larson.

On March 13, 2007, United States Bankruptcy Judge Kathleen Thompson found that Respondent Oxman's opposition to the compromise was frivolous and filed with an improper purpose.  As a result, the court ordered Respondent Oxman to pay $5,084 in sanctions to Larson within 45 days.  That order was served by the court's clerk on March 13, 2007, by mailing it to Respondent Oxman's law office at the address indicated on the pleadings he had filed with that court.  The order was received by Respondent Oxman.

On July 18, 2007, Respondent Oxman attended a meeting with Fuchs and Gilfillan for the purpose of discussing settlement of the various disputes arising out of the Larson matters.  At the time of this meeting Respondent Oxman had still not paid the $5,084 sanction award, even

though the time for him to do so had now expired.  At the meeting, he was handed a copy of the court's order by Gilfillan, who was taking steps to file a motion to have Respondent Oxman be held in contempt.  An oral agreement was reached that day for a settlement of the various disputes, whereby Oxman was to pay Larson $9,000 over the course of nine months, among other agreements.  This settlement payment included satisfaction of the sanction order.

On August 9, 2007, well more than 30 days after Respondent Oxman was aware of the entry of the sanction order, Respondent Oxman, Larson, and Fuchs signed a settlement agreement whereby Oxman was to pay Larson the $9,000 over the course of nine months, thereby satisfying the award of sanctions.  Once this settlement agreement was signed, Respondent sent a copy of it, together with the March 13, 2007 order awarding sanctions, to the State Bar.  This was the first time that Respondent Oxman had provided notification of the sanction order to the State Bar.

### Count 1 – Section 6103 [Failure to Obey Court Order]

At the request of the parties, this count was dismissed with prejudice by the court during the course of the trial.  That dismissal is hereby reaffirmed.

### Count 2 – Section 6068, Subdivision (o)(3) [Failure to Report Judicial Sanctions]

Section 6068, subdivision (o)(3) requires an attorney to report to the State Bar any imposition of judicial sanctions against the attorney, except for sanctions for failure to make discovery or monetary sanctions of less than one thousand dollars ($1,000).  That report must be in writing and must be made within 30 days of the time the attorney has knowledge of the sanctions.

Respondent Oxman did not report the $5,084 sanction order by the bankruptcy court to the State Bar until August 9, 2007.  He had knowledge of that order more than 30 days prior to that date.  He was served with a copy of the order by the court clerk on March 13, 2007.  He was

again reminded of the order when the Fuchs firm included it in two separate pleadings filed on May 17, 2007 and June 14, 2007[3] in conjunction with a demurrer to Respondent Oxman's cross-complaint in the ongoing litigation between Respondent Oxman and Fuchs and Larson. Those pleadings were served on both Respondents by mailing them to the same address as had previously been provided by Respondent Oxman to the bankruptcy court. That address was then, and continues to be, the official membership address of Respondent Jaroscak, to whom these pleadings were also addressed.

Respondent's testimony that he did not receive any of the above pleadings and had no knowledge of the sanction order is not credible and lacked candor. His claimed recollection of the chronology of events was demonstrated to be quite inaccurate. For example, Respondent Oxman testified that he was not aware that the bankruptcy court had overruled his objections until July 2007. He also recalled that the bankruptcy court had first overruled his objections at the same time and in the same order in which it had awarded sanctions. That testimony was completely in error. The court's order awarding sanctions did not purport to overrule Respondent's objections. Instead, it recited that the court had previously heard his objections at the hearing in October 2006, and that a written order overruling them had been entered in November 2006.

The same is true with regard to his claim that he was not aware of the court's overruling of his objections until July 2007. Instead, the pleading that Respondent Oxman filed on

---

[3] Respondents filed a motion to exclude evidence of these pleadings based on the State Bar's failure to disclose them during the pretrial disclosure process. The State Bar, however, presented evidence that the documents were only provided to them after the pretrial disclosure process had been completed. While the court would have preferred that the State Bar had disclosed them to the Respondents at an earlier time or treated them as true rebuttal documents, it does not view that failure to warrant the complete exclusion of the evidence. Accordingly, the motion is denied.

November 21, 2006, in opposition to the motion for sanctions, <u>makes explicit reference to his awareness that his objections had then already been overruled</u>:

> The Objection requested the Court reopen the Axelrod Bankruptcy to permit Mr. Oxman and Oxman and Jaroscak to file an adversary complaint which set forth their claims against the responsible parties.  The Objection stated: …[quotation omitted]. [¶] The suggestion that Mr. Oxman did not have a right to request the Court to permit him to file an adversary complaint where he would set forth his rights to request subrogation and "rights to receive payment by operation of law" is without merit.  Mr. Oxman had a right to request this Court apportion the payment between the various lawsuits to which Mr. Oxman and Oxman and Jaroscak were and were not parties.  There can be no bad faith, frivolous, or misuse of the Court to harass Plaintiff Larson when Mr. Oxman and Oxman and Jaroscak come to the Court to request the right to file an adversary complaint to assert whatever rights they may have." [¶] *<u>The Court's refusal to permit the filing of an adversary complaint was inappropriate.  Mr. Oxman and Oxman and Jaroscak requested the right to assert their apportionment between the claims so that they would not be prejudiced by the settlement.  Instead of permitting them to do so, the Court denied the motion without cause.</u>*" [Emphasis added; Exh. 9, p. 9:5-22.)

This court also finds not credible Respondent Oxman's contention that he did not receive any of the above pleadings.  He based this claim on his assertion that all of the above pleadings were addressed to 14126 E. Rosecrans <u>Boulevard</u>, when his office is technically located on Rosecrans <u>Avenue</u>.  The "Rosecrans Blvd." address, however, is the formal address that has consistently been given by the Respondents as their law office's address, both in the bankruptcy action and in every other matter relevant to this action.[4]  It is apparent that Respondents routinely received other pleadings and correspondence in all of these same matters mailed to that address.  Indeed, with regard to the above demurrer to the cross-complaint, Respondent acknowledges filing an amended complaint after the demurrer had been filed.  His testimony that he was aware of the demurrer from seeing it listed on the docket and then filed an amended complaint without bothering to learn the substance of the pending demurrer is not credible.

---

[4] It was, and remains, the formal State Bar membership address provided by Respondent Jaroscak.  It was also the address used by her for at least one of her bank accounts.  The court further notes that the address used in sending out the challenged pleadings included the zip code for Respondent Oxman's office.  There is no evidence of there being both a Rosecrans <u>Avenue</u> and a Rosecrans <u>Blvd</u>. within that same zip code.

For all of the above reasons, the court concludes that Respondent Oxman's failure to provide notice to the State Bar of the March 13, 2007 sanction order prior to August 9, 2007, constituted a willful violation by him of section 6068, subdivision (o)(3).

**Case No. 07-O-13696**
*[Jaroscak only]*

On January 19, 1992, Lyle Quatrochi ("Lyle") and Martha Quatrochi ("Martha") created the "Lyle and Martha Quatrochi Family Trust" (Quatrochi Family Trust), naming themselves as co-trustees and their two children, Gerald Quatrochi ("Gerald") and Susan Quatrochi McIntire ("Susan"), as beneficiaries. Respondent Jaroscak did not prepare the Trust agreement.

Years later, in July, 1999, Lyle and Martha employed Respondent Jaroscak for, among other things, estate planning purposes.

In March of 2001, Martha died.

On November 16, 2001, Lyle signed a power of attorney prepared by Respondent Jaroscak, naming Respondent Jaroscak as his "agent (attorney in fact)" concerning all financial transactions. Respondent Jaroscak signed the power of attorney, accepting the appointment.

On December 7, 2001, Lyle sold the family home, which was held by the Quatrochi Family Trust. The proceeds from the sale, amounting to $591,374.37, were made payable to the Quatrochi Family Trust and were sent to Respondent Jaroscak. Respondent Jaroscak received the proceeds and deposited the funds in an account held in the name of the Quatrochi Family Trust at California National Bank.

On January 24, 2002, Lyle executed an amendment to Quatrochi Family Trust, naming Respondent Jaroscak as the sole trustee and designating Gerald as the possible successor trustee.

In April of 2002, Gerald became unhappy that Respondent Jaroscak was handling his father's affairs and sought to take over. He demanded that the proceeds of the sale of the home be transferred to him and sought to have Lyle execute a new power of attorney in favor of

-8-

Gerald.  Respondent Jaroscak declined to relinquish the proceeds of the sale, explaining that the funds belonged to the family trust, over which she was the trustee.  Gerald then hired an attorney (Roberta Taylor) to challenge Respondent Jaroscak's authority and he complained to the State Bar.

On June 1, 2002, Lyle died.  According to the terms of the Quatrochi Family Trust, on the death of both Lyle and Martha, the trustee was to distribute the remaining corpus of the trust to the beneficiaries, Gerald and Susan.  In accordance with the trust agreement, Respondent Jaroscak distributed $50,000 to Gerald and $50,000 to Susan from the Quatrochi Family Trust in July 2002.

During this same time period, the State Bar contacted Respondent Jaroscak regarding Gerald's complaint.  On July 30, 2002, Respondent Jaroscak sent an extensive letter to the State Bar, explaining the history of her representation of Lyle and her actions as trustee.  With this letter she sent an accounting of the trust, reported that she had already made the partial distribution of $100,000, and stated, "When all of Lyle Quatrochi's matters and final bills are paid, I will distribute the balance of the Trust to his children as provided in the Trust, which I expect to happen within the next 30 days."

In late September 2002, Respondent Jaroscak received a letter from a new attorney for Gerald and Susan, Stanley Lieber (Lieber), indicating that he had been asked to "substitute in on their behalf on all matters pending, including probate matters that you might be handling."  He asked that Respondent Jaroscak turn over her files to him within the next week and enclosed an authorization from Gerald.  In response, Respondent Jaroscak wrote Lieber on October 11, 2002, explaining to him that she was the trustee of the trust, not an attorney handling a probate matter. She reported to him on the prior partial distribution of the trust corpus and stated that she had just

-9-

completed the accounting for the trust and anticipated distributing the balance of the corpus to the beneficiaries in the following week:

> "The only remaining asset is Lyle Quatrochi's IRA account and the beneficiary of the IRA is the Trust. The bank will distribute the IRA to the Trust once we have received our federal tax id number. The proceeds will then be distributed equally to Gerry and Susan once I have determined the income tax liability due on the proceeds of the IRA. I have also discussed this with Gerry Quatrochi who called me yesterday."

On October 18, 2002, Respondent Jaroscak distributed $246,257.48 to Gerald and $246,257.48 to Susan from the Quatrochi Family Trust. The distribution checks were forwarded to each beneficiary with an explanatory letter dated October 22, 2002. In this letter, Respondent Jaroscak provided an accounting of the trust assets up to that time, forwarded a bill for her services, and indicated that only two remaining assets remained to be distributed. The first of the assets was $56,648.17 still deposited in Lyle's IRA account. Respondent Jaroscak explained that this money would soon be distributed, but only after funds had been withheld from it to cover anticipated incomes taxes. She stated that she anticipated that this distribution would take place in the next week. The second remaining trust asset was approximately $12,000 remaining in the trust's Money Market account at California National Bank. Respondent Jaroscak stated that this money would be used to cover her trustee fees, as well as any other fees or unknown contingencies. The remaining balance would then be distributed to Gerald and Susan. Respondent Jaroscak's enclosed bill for trustee services totaled $11,930.10. She ended her letter by asking for the beneficiaries' approval of her bill and stated that, if such approval was not provided, she would "file a petition with the court for approval of the accounting and fees as set forth in the invoice." Copies of the letters and enclosures were sent to Lieber's office.

The beneficiaries did not consent to Respondent Jaroscak's proposed handling or the payment of her bill. Instead, they contended that withholding any money for potential tax liability was unnecessary and could be avoided. They also protested her bill, which included

several thousand dollars of charges for Respondent Jaroscak's responding to the beneficiaries' complaint to the State Bar.

Rather than file a petition to the Superior Court for approval of her bill and accounting, as Respondent Jaroscak had said she would do, Respondent Jaroscak's response to the protest over her proposed handling was to do nothing. She did not respond to letters, telephone calls, or requests from Lieber or Gerald that she turn over the trust corpus or resign as trustee. She ignored communications from Lieber, complaining and warning that her continued inaction would necessitate the filing of a petition to have her removed as trustee. Respondent Jaroscak continued to hold the trust funds from October 2002 until well into 2008. Throughout that time she was receiving the monthly bank statements on the accounts, making clear to her that she continued to control access to those funds.

As Lieber had warned, the beneficiaries' eventual response to Respondent Jaroscak's inaction was to seek to have her removed as trustee. In March 2003, Lieber filed a petition in the Los Angeles Superior Court, requesting Respondent Jaroscak's removal as trustee and the release of the trust funds. Two years later, Lieber was still in the process of preparing a petition that was in a form acceptable to the Superior Court. During this entire time, Respondent Jaroscak had not made any sort of appearance in the action. On February 24, 2006, Lieber filed a Third Amended Verified Petition for Removal of Respondent Jaroscak as Trustee of the Quatrochi Family Trust in Los Angeles Superior Court, case no. VP009421, entitled *In re: Susan McIntire and Gerald Quatrochi v. Jaroscak*. Lieber then ran into difficulties getting the pleading personally served on Respondent Jaroscak. He sent copies to her in the mail but she did not respond to them. He then hired an investigator to seek to make personal service, but that effort was also unsuccessful. Service of the petition was only eventually perfected in early 2007 by the physically posting of the pleading. This pleading accused Respondent Jaroscak of unscrupulous

-11-

conduct, asked that she be removed as trustee, and sought both an accounting and an award of attorneys' fees.

When Respondent Jaroscak was successfully served with the petition, the petition had a scheduled hearing date of February 6, 2007.  Respondent Jaroscak asked that her husband, Respondent Oxman, handle the matter for her.

On February 5, 2007, Respondent Oxman and Lieber spoke by telephone.  Respondent Oxman then sent Lieber a fax on the same date.  In this fax, Respondent Oxman indicated that more than $76,325.67 of trust money was still being held by Respondent Jaroscak in various bank accounts at California National Bank.  He then provided a list of the balances for the accounts, although noting that the amounts for the two IRA accounts did not include the accrued interest for 2006.[5]  These account balances were shown during trial to have been inaccurate, significantly overstating the cumulative value of the retained monies.  The fax included account numbers for the two IRA accounts, but not for the other two bank accounts.  At the conclusion of this fax, the following proposal was made on behalf of Respondent Jaroscak: "Ms. Jaroscak has asked your clients to pay her fees which were billed in 2002 and total $11,930.10 in fees and costs.  If you will do so, Ms. Jaroscak will execute a Substitution of Trustee in favor of your clients and they will be free to manage the accounts as they see appropriate."  Gerald and Susan did not agree to this proposal.

---

[5] During trial, Respondent Oxman testified that he and his wife had gone to the bank before the scheduled hearing to get information about the accounts and had been told that no information would be given because Respondent Jaroscak was no longer the trustee.  This testimony, clearly intended to support Respondent Jaroscak's subsequent claim that she had resigned as trustee in early 2003, lacked candor.  At trial, it was repudiated by Respondent Jaroscak during her testimony.  Further, in Respondent Oxman's fax of February 5, 2007, he stated that the bank had previously provided them with information about the accounts: "California National bank has told us we should have the final figure [regarding accrued interest] within the next seven (7) days."

On February 6, 2007, a hearing on the petition to remove Respondent Jaroscak as trustee was scheduled to be held in Los Angeles Superior Court Case.  Respondent Oxman appeared at court on behalf of Respondent Jaroscak at this scheduled hearing but secured a continuance of the hearing until April 5, 2007.  Between February 6, 2007 and April 5, 2007, Respondent Jaroscak then filed no formal response to the petition.  Nor did she take any steps to resign as trustee, provide any further accounting, or seek approval of her prior accounting or requested fees.  According to testimony provided by Respondent Jaroscak during the trial of this matter, she had decided merely to allow her default to be taken in the case.

On April 5, 2007, the continued hearing was held on the petition to remove Respondent Jaroscak as trustee.  Neither Respondent Oxman nor Respondent Jaroscak appeared.  On April 23, 2007, Respondent Jaroscak was removed as trustee by the court and was ordered to prepare an accounting and to release all funds belonging to the trust.  Lieber then had problems getting Respondent Jaroscak served with the order.  Because Respondent Jaroscak had never appeared in the action, it was again necessary to have her personally served with the order.

On October 17, 2007, and on November 19, 2007, a State Bar investigator mailed letters to Respondent Jaroscak at her official membership records address, requesting that Respondent Jaroscak respond in writing to a complaint filed by Lieber.  In these letters, the State Bar asked that Respondent Jaroscak provide information regarding the location and status of the more than $70,000 of trust funds still being held by her.  Respondent Jaroscak received the letters.  Consistent with her decision to ignore the Superior Court action, she did not respond to the State Bar's inquiries.

On June 6, 2008, more than a year after Respondent Jaroscak had been removed as trustee and ordered to provide an accounting, Gerald was finally able to obtain the Quatrochi Family Trust funds located at California National Bank using the court orders from Los Angeles

-13-

Superior Court.  Between 2002 and 2008, he had incurred approximately $20,000 in legal fees and costs to obtain those funds.

### <u>Count 3 – Section 6106 [Moral Turpitude – Breach of Fiduciary Duty]</u>

Section 6106 prohibits an attorney from engaging in conduct involving moral turpitude, dishonesty or corruption.  "'[H]abitual disregard by an attorney of the interests of his or her clients combined with failure to communicate with such clients constitute acts of moral turpitude justifying disbarment.  [citations omitted.]'"  (*Kent v. State Bar* (1987) 43 Cal.3d 729, 735; quoting *McMorris v. State Bar* (1983) 35 Cal.3d 77, 85.)  An attorney's deliberate breach of a fiduciary duty to a client involves moral turpitude as a matter of law.  (*In the Matter of Kittrell* (Review Dept. 2000) 4 Cal. State Bar Ct. Rptr. 195, 208.)  Further, an attorney's non-deliberate breach of a fiduciary duty to a client involves moral turpitude even if the breach occurred as a result of the attorney's gross carelessness and negligence.  (*Id.,* citing *Lipson v. State Bar* (1991) 53 Cal.3d 1010, 1020; *In the Matter of Rubens* (Review Dept. 1995) 3 Cal. State Bar Ct. Rptr. 468, 478.)  This is true even in the absence of an attorney-client relationship.  An attorney who accepts the responsibility of a fiduciary nature is held to the high standards of the legal professional whether or not he acts in his capacity of an attorney.  (*In the Matter of Kittrell, supra,* 4 Cal. State Bar Ct. Rptr. at 208, quoting *Worth v. State Bar* (1976) 17 Cal.3d 337, 341.)

Respondent Jaroscak's intentional and ongoing decision to ignore her obligations to distribute monies held by her in trust, her failure and refusal to respond to the demands of the trust's beneficiaries that she communicate with them regarding the status of the funds and make distribution of them, and her conscious decision to ignore the legal proceedings that were brought as a result of her conscious disregard of her duties constitute acts of moral turpitude and intentional and willful violations of section 6106.  (cf. *Jackson v. State Bar* (1975) 15 Cal.3d 372, 380-381; see also *McKnight v. State Bar* (1991) 53 Cal.3d 1025, 1033-1034.)

At trial, Respondent Jaroscak and Respondent Oxman sought to justify Respondent Jaroscak's prior disregard of the beneficiaries by claiming that they had discovered just prior to trial a disk drive containing a scanned copy of Respondent Jaroscak's file on the trust matter. They claimed that they had previously been unable to locate that file.  On this disk drive, there purportedly was a document allegedly sent by Respondent Jaroscak to Gerald in March 2003, indicating that Respondent Jaroscak intended to resign, or was actually resigning, as trustee.

This testimony by Respondent Jaroscak and Respondent Oxman was not credible and lacked candor.  From March 2003 until 2010, no claim was ever made by Respondent Jaroscak that she had previously resigned as trustee in 2003, despite the many ongoing demands being made that she do so.  Instead, when she was finally served with the petition to remove her as trustee in early 2007, she offered to resign, but only on the condition that the beneficiaries agree to pay her outstanding legal fees.

Both Gerald and attorney Lieber, who was representing Gerald at the time, credibly denied ever seeing the purported 2003 resignation letter.  Had Respondent Jaroscak offered to resign in 2003, the extensive subsequent actions of these individuals to have her removed as trustee would have made no sense.  Further, the resignation document, purportedly sent by Respondent Jaroscak to Gerald, had a provision for him to provide an acknowledging signature. Respondent Jaroscak never received any response from either Gerald or Lieber to this purported resignation effort, and there is no evidence of any follow-up effort by Respondent Jaroscak to perfect or confirm the purported resignation or to make certain that trust assets (controlled by her) were transferred by the bank into the name of Gerald.

Nor is there any indication that Respondent Jaroscak actually believed at any time during the seven year period from March 2003 until 2010 that that she had previously resigned. Throughout the period from 2003 to 2008, Respondent Jaroscak continued to receive the bank

statements on the trust accounts.  Had Respondent Jaroscak believed that she was no longer

trustee, she would have been expected to have taken steps to determine why the accounts were

still be held by the bank in her name, especially since efforts were being made throughout this

time to serve her with legal process to require her resignation.  Further, in responding to the legal

action in which Respondent Jaroscak was being accused of unscrupulous conduct and being

asked to pay attorneys fees, it would be expected that she would have been quick to point out her

prior resignation attempts as a defense, rather than allow her default to be taken.  This she never

did.  The same is true with respect to Respondent Jaroscak's decision to ignore the inquiries in

2007 by the State Bar.

Finally, no explanation was provided by respondents as to why there would even be a

disk drive having a scanned copy of the lost file, why that disk drive was only located weeks

before the instant trial, where the disk drive had been located in the intervening years, why it was

not "discovered" earlier, or what other information regarding the trust was contained on the disk

drive.  Lastly, the disk drive itself was not presented to the court to show that the "newly

discovered" document was not of recent origin.  The index of the files stored on the disk drive

would have shown when the scanned document had been stored there.

### Count 4 – Section 6068, Subdivision (i) [Failure to Cooperate]

Section 6068, subdivision (i), of the Business and Professions Code, subject to

constitutional and statutory privileges, requires attorneys to cooperate and participate in any

disciplinary investigation or other regulatory or disciplinary proceeding pending against that

attorney.

On or about October 17, 2007, and November 19, 2007, a State Bar investigator mailed

letters to Respondent Jaroscak at her official membership records address, requesting that she

respond in writing to a complaint regarding the disbursement of the funds belonging to the

Quatrochi Family Trust.  Respondent received these letters.  Respondent Jaroscak has stipulated that she did not respond in writing to the State Bar letters of October 17, 2007, and November 19, 2007.  She has further stipulated, that by not providing a written response to the investigator's letters of October 17, 2007, and November 19, 2007, or otherwise cooperating or participating in the disciplinary investigation, she failed to cooperate in a disciplinary investigation in willful violation of section 6068, subdivision (i).

**Case Nos. 08-O-12328 and 09-O-12276**
*[Oxman and Jaroscak]*

Since at least 2006, respondents have been experiencing financial problems.  These problems became magnified in the latter part of 2007, when a series of debts started being recorded against Respondent Oxman by various creditors.  Among these creditors were (1) the Franchise Tax Board of the State of California, which caused to be recorded on December 11, 2007, a $10,373 lien against Respondent Oxman for claimed unpaid taxes in 2005; and (2) Zachary D. Wechslar, who had prevailed in a civil action against Respondent Oxman and had caused to be recorded an Abstract of Judgment against Respondent Oxman in the amount of $24,868.35.

The respondents' financial problems increased in early 2008, when the State of California Franchise Tax Board caused to be recorded on April 24, 2008, a lien in the amount of $10,725.08 against Respondent Jaroscak for the taxable year 2005.

From January 1, 2008 through July 31, 2008, the law firm of Oxman & Jaroscak maintained a client trust account at Wells Fargo Bank titled "R. Brian Oxman – Attorney Trust Account" (CTA).  Because of these various creditors and liens, respondents took steps beginning in the late part of December 2007 to shelter the funds normally going through their law firm operating account from being attached by respondents' creditors.  These steps included using the CTA to prevent their creditors from having access to their funds.

-17-

In December 2007, within days after the Franchise Tax Board had recorded its lien, Respondent Jaroscak opened a Manhattan Life Capital Account, using money advanced to her by her mother.  This bank account was payable through the State Street Bank , located in Boston, Massachusetts.  At the time that Respondent Jaroscak opened the account, the Franchise Tax Board had not yet recorded its 2005 lien against her.  Only her name appeared on the account.

Once the account had been opened, Respondent Jaroscak would periodically, but frequently, transfer funds from this account to the firm for various purposes.  Rather than pay the money into the firm's normal operating account, Respondent Jaroscak would pay it into the CTA.  From the CTA these funds would then be used to pay various firm and personal expenses directly, such as costs associated with appealing the *Wechsler* judgment against Respondent Oxman, the cost of Respondent Oxman hiring an attorney to represent him in a prior State Bar disciplinary proceeding, and miscellaneous expenses associated with pursuing cases on behalf of various firm clients.

Respondents also used the CTA to hide the income they were receiving from their various professional efforts.  Illustrative of this practice was their handling of funds being received by each of them personally several times a month from their teaching activities at Irvine University.  Both respondents taught classes there and were paid by check within days after teaching each class.  These funds were earned income and should not have been placed in the CTA.  Nonetheless, throughout the period from January 2008 through June 2008, these checks were routinely deposited into the CTA.

When it came time for respondents to withdraw the earned income from the CTA for some purpose, they did not transfer it to the firm's operating account or pay it directly to themselves as draw or salary.  Instead, the money was sometimes paid directly to a particular

vendor.  In most instances, however, the funds were paid by check to the South Coast Preschool (SCPA), which was a business owned by Respondent Jaroscak.

This same practice, of putting funds into the CTA and then disbursing them to SCPA, was also followed with regard to fees paid to respondents by attorney Tuan Lam, for whom the respondents did consulting work.  In addition, the practice was used with regard to funds received for a client as a result of a settlement.[6]  By transferring the funds in and out of the law firm in this manner, the funds were never visible to respondents' creditors and were never subject to the recorded liens.

Respondent Jaroscak contends that the money coming from the Manhattan Capital account represented monies held in trust by her as trustee under a trust created by her mother.  That testimony was not credible.  The money in the Manhattan Capital account was held only in the name of Respondent Jaroscak.  There was no indication that the account was a designated trust account.  The purported trust created by Respondent Jaroscak in December 2007 was clearly a sham to seek to further protect the funds being given to Respondent Jaroscak by her mother from respondents' creditors.  Respondent Jaroscak's handling of the money once it was received frequently did not comply with the terms of the purported trust, and she made no effort to perform the duties of a trustee that would normally be expected.

Respondents seek to justify their deposit and retention of the teaching income and Lam funds into the CTA by claiming that Lam sometimes occasionally covered classes for them at the University and they were retaining the funds in the CTA until their entitlement to the funds could

---

[6] On January 31, 2008, respondents received a settlement check for $10,000 from Santa Barbara County for their client A. Daniels.  This check was properly deposited into their CTA. On the following day, a check for $6,666.67 was issued to the client.  No money for earned fees was taken out of the CTA by the firm at that time.  Instead, three days later, on February 4, a check was issued to SCPA for $1,000.  On February 10, another check for $1,000 was sent to SCPA.  Ten days later, on February 20, yet another check for $1,000 was issued to SCPA. Finally, on February 22, 2008, the final $333.33 of the firm's fee was sent to SCPA.  None of the fees went through the firm's operating account.

-19-

be reconciled.  That explanation by Respondents was not credible.  No portion of these funds was ever paid out to Lam.[7]  Quite the contrary, he was frequently paying money to respondents for their work shortly after their classes had been taught at the university.  Had Lam believed he was entitled to any portion of the fees being paid to respondents for those classes, it would be expected that he would be withholding money, not distributing it.  at no time during the period from January 1, 2008 to June 30, 2008, was any of the money coming to respondents from either the teaching activities at Irvine University or from Lam was ever paid over to Lam.

### Count 5 – Rule 4-100(A) [Commingling Personal Funds in Client Trust Account]
*[Oxman and Jaroscak]*

In this count, the State Bar alleges that Respondents Oxman and Jaroscak commingled their personal funds in their client trust account (CTA), in violation of rule 4-100(A).  This rule provides that all funds received or held for the benefit of clients must be deposited in an identifiable bank account which is properly labeled as a client trust account and that no funds belonging to an attorney or law firm shall be deposited in such an account or otherwise commingled with such funds.

Respondents violated rule 4-100(A) by depositing into the CTA their personal funds, including but not limited to the fees they earned from their teaching activities and consulting work for attorney Lam.  In addition, they violated rule 4-100(A) by using the CTA to pay personal expenses.

### Count 6 – Section 6106 [Moral Turpitude – Dishonesty]
*[Oxman and Jaroscak]*

As previously noted, section 6106 prohibits an attorney from engaging in conduct involving moral turpitude, dishonesty or corruption.  Respondents' use of their client trust

---

[7] In addition, he was not a client of the firm.

account to shield their funds from their creditors and the taxing authorities constituted knowing and willful acts of moral turpitude.

### Count 7 – Section 6068, Subdivision (i) [Failure to Cooperate]
*Oxman only (Case No. 08-O-12328)*

Respondent Oxman has stipulated that on February 3, 2009, a State Bar Investigator mailed a letter to him at his official membership records address, requesting that Respondent Oxman respond in writing to a State Bar investigation concerning the fact that Respondent Oxman's CTA was subpoenaed and requesting a response to the commingling charge. Respondent Oxman received the letter.  Respondent Oxman did not respond to this letter.

Respondent Oxman has further stipulated that, by not providing a written response to the investigator's February 3, 2009 letter, inquiring about the alleged violations of depositing personal funds in his CTA and using his CTA to pay for personal expenses, or otherwise cooperating or participating in the disciplinary investigation, he failed to cooperate in a disciplinary investigation in willful violation of Business and Professions Code, section 6068, subdivision (i).

### Count 8 – Section 6068, Subdivision (i) [Failure to Cooperate]
*Jaroscak only (Case No.09-O-12276)*

On June 10, 2009, a State Bar Investigator mailed a letter, via certified mail, to Respondent Jaroscak at her official membership records address, requesting that Respondent Jaroscak respond in writing to a State Bar investigation concerning Respondent Jaroscak's possible misuse of the CTA.  The letter was returned by the US Post Office as "unclaimed."

On July 7, 2009, the same investigator sent a second letter, via certified mail, to Respondent Jaroscak, again asking that she respond in writing to the issues surrounding her CTA.  The investigator attached with this second letter a copy of the June 10, 2009 letter.  This

certified letter was signed for by Respondent Jaroscak's mother and was received by Respondent Jaroscak.

Respondent Jaroscak did not respond in writing to these State Bar letters. By not providing a written response to these letters, or otherwise cooperating or participating in the disciplinary investigation, Respondent Jaroscak failed to cooperate in a disciplinary investigation in willful violation of section 6068, subdivision (i).

## Aggravating Circumstances

The State Bar bears the burden of proving aggravating circumstances by clear and convincing evidence. (Rules Proc. of State Bar, tit. IV, Stds. for Atty. Sanctions for Prof. Misconduct, std. 1.2(b).)[8] The court makes the following findings with regard to possible aggravating factors.

### *Respondent Oxman*

**Prior Discipline**

Respondent Oxman has been formally disciplined on two prior occasions.

In February 1998, he was privately reproved in case no. 96-O-06475 for violations of rule 3-100(A) in one client matter and section 6068, subdivision (i) [failure to respond to a State Bar investigation inquiry re client complaint] in a second client matter. As part of the disciplinary order in that matter, Respondent was ordered to take the State Bar Ethics School and complete six hours of MCLE in ethics, attorney/client relations, and/or law office management classes.

In December 2009, the Supreme Court issued an order (S177649) in case no. 04-O-13344, suspending Respondent Oxman for two years, stayed, and placing him on probation for two years. This discipline was based on a stipulation signed by Respondent, acknowledging violations by him of section 6068, subdivision (c) [maintaining an action after it no longer appeared to be legal or just] and section 6103 [failure to pay court-ordered monetary sanction]. This misconduct began in early 2003 and continued into 2005 and related to a civil action brought by Respondent, as counsel, against John Fuchs and Christopher Larson.

Respondent's prior record of discipline is an aggravating circumstance. (Std. 1.2(b)(i).)

---

[8] All further references to standard(s) or std. are to this source.

**Multiple Acts of Misconduct**

Respondent Oxman has been found culpable of four counts of misconduct in the present proceeding, including multiple instances of inappropriate use of his client trust account. The existence of such multiple acts of misconduct is an aggravating circumstance. (Std. 1.2(b)(ii).)

**Significant Harm**

Standard 1.2(b)(iv) provides for aggravation when "the member's misconduct harmed significantly a client, the public or the administration of justice." The State Bar argues that Respondent's participation in efforts to shield his assets from his creditors and the taxing authorities caused cognizable significant harm under this standard. The evidence, however, does not provide clear and convincing proof to establish any such harm.

With regard to the tax liens, both respondents argue that the liens did not reflect actual taxes owed, but only that tax returns had not been filed. Once the tax returns were filed, the liens were released with no taxes owing. The State Bar did not show that payment of any significant taxes was actually avoided or delayed by virtue of the inappropriate use by respondents of their CTA.

With regard to the *Wechsler* judgment, the evidence at trial indicated that this judgment was on appeal at the time of the misconduct. There was no evidence that Wechsler ever sought to collect on the judgment during that appeal (or at all) or that the mishandling of the CTA actually caused any harm to him.

**Bad Faith, Dishonesty [Std. 1.2(b)(iii)]**

The court rejects the State Bar's contention that the court should aggravate Respondent Oxman's misconduct because it was surrounded by bad faith, dishonesty, and concealment. (Std. 1.2(b)(iii).) This argument is based on the fact that the mishandling of the CTA was motivated to shield money from existing creditors. The court declines to treat that fact as an

-23-

additional aggravating factor.  It is already the basis for a finding of culpability of violating

section 6106.  The Review Department has long held that it is duplicative, and therefore

improper, to find aggravation based on acts involving bad faith, dishonesty, or concealment

when the same acts are relied on to establish the respondent's culpability of violating section

6106.  (E.g., *In the Matter of Chesnut* (Review Dept. 2000) 4 Cal. State Bar Ct. Rptr. 166, 176;

*In the Matter of Fandey* (Review Dept. 1994) 2 Cal. State Bar Ct. Rptr. 767, 777.)

**Indifference/Lack of Candor**

Respondent Oxman displayed a lack of candor with this court during his testimony in this

matter.  Such a lack of honesty with this court is a substantial aggravating factor.  (Std.

1.2(b)(vi), *In the Matter of Maloney and Virsik* (Review Dept. 2005) 4 Cal. State Bar Ct. Rptr.

774, 791-2); *In the Matter of Dahlz* (Review Dept. 2001) 4 Cal. State Bar Ct. Rptr. 269, 282-3.)

In addition, his lack of recognition of the inappropriateness of the handling of the CTA is an

aggravating factor.

***Respondent Jaroscak***

**Multiple Acts of Misconduct**

Respondent Jaroscak has been found culpable of five counts of misconduct in the present

proceeding, including multiple instances of inappropriate use of her client trust account.  The

existence of such multiple acts of misconduct is an aggravating circumstance.  (Std. 1.2(b)(ii).)

**Significant Harm**

Respondent Jaroscak's mishandling of the Quatrochi Family Trust caused the

beneficiaries of that trust substantial harm.  This is an aggravating factor.  (Std. 1.2(b)(iv).)  They

were deprived of the use of the remaining proceeds of the trust (approaching $70,000) for six

years.  To finally get access to the money, they were required to expend thousands of dollars for

attorneys' fees and costs.  In addition, Respondent Jaroscak's ongoing decision to ignore her

-24-

obligations as trustee, including her decision to allow her default to be taken in the civil action brought against her, resulted in the courts being required to spend considerable time and energy removing her as the trustee.  Such is harm to the administration of justice.

### Indifference/Lack of Candor

Respondent displayed a lack of candor with this court during her testimony in this matter. Such a lack of honesty with this court is a substantial aggravating factor.  (Std. 1.2(b)(vi).)  In addition, her lack of recognition of the inappropriateness of her handling of both the CTA and the Quatrochi Family Trust is an aggravating factor.

## Mitigating Circumstances

A respondent bears the burden of proving mitigating circumstances by clear and convincing evidence.  (Standard 1.2(e).)  The court makes the following findings with regard to possible aggravating factors.

### *Respondent Oxman*

#### Cooperation

Respondents entered into an extensive stipulation of facts, thereby assisting the State Bar in the prosecution of the case.  Respondent Oxman also admitted to certain of the alleged violations in this case.  For this cooperation, he is entitled to some mitigation credit. (Std. 1.2(e)(v); see also *In the Matter of Gadda* (Review Dept. 2002) 4 Cal. State Bar Ct. Rptr. 416, 443; *In the Matter of Riordan* (Review Dept. 2007) 5 Cal. State Bar Ct. Rptr. 41, 50.)

#### Emotional Difficulties

Extreme emotional difficulties may be considered mitigating where it is established by expert testimony that they were responsible for the attorney's misconduct.  (Std. 1.2(e)(iv); *In the Matter of Frazier* (Review Dept. 1991) 1 Cal. State Bar Ct. Rptr. 676, 701-702.)  Respondent Oxman presented evidence that he had been depressed since as early as 2006 because of his

financial problems and disciplinary issues.  Those factors led to him going into the Lawyers

Assistance Program in August 2006.  He also testified to the emotional upset and grief suffered

by both respondents as a result of the illness and death of Respondent Jaroscak's mother,

Marjorie Jaroscak, in 2009.

      The evidence offered by Respondent Oxman regarding the emotional difficulties he had

in the past did not provide clear and convincing evidence that his problems are a mitigating

factor here.  There was no expert testimony, or other convincing evidence, showing the required

nexus between Respondent's claimed emotional problems and his misconduct.  Nor was there

sufficient evidence for this court to conclude that any emotional problems suffered by

Respondent in the past have now been satisfactorily resolved.

### Pro Bono/Community Service

      Respondent Oxman testified that he had performed pro bono work for the Plotkin Bail

School at various times in the past and has expended considerable time assisting in mock trial

competitions.  For these efforts, he is entitled to some mitigation credit.

### Character Evidence

      Although there was some favorable evidence provided regarding Respondent Oxman's

character, the evidence did not come from "a wide range of references in the legal and general

communities and who are aware of the full extent of the member's misconduct." (Std. 1.2(e)(vi).)

The court accords Respondent Oxman only nominal mitigation credit for this evidence.  (*In the*

*Matter of Kreitenberg* (Review Dept. 2002) 4 Cal. State Bar Ct. Rptr. 469, 476-477; *In the*

*Matter of Johnson* (Review Dept. 2000) 4 Cal. State Bar Ct. Rptr. 179, 190; In *the Matter of*

*Respondent K* (Review Dept. 1993) 2 Cal. State Bar Ct. Rptr. 335, 359.)

## *Respondent Jaroscak*

**No Prior Discipline**

Respondent Jaroscak had practiced law in California for more than 17 years prior to the commencement of the instant misconduct.  During that span, she had no prior record of discipline.  Respondent Jaroscak's lengthy tenure of discipline-free practice is entitled to significant weight in mitigation.  (Std. 1.2(e)(i).)

**Cooperation**

Respondents entered into an extensive stipulation of facts, thereby assisting the State Bar in the prosecution of the case.  Respondent Jaroscak also admitted to one of the alleged violations in this case.  For this cooperation, she is entitled to some mitigation credit.  (Std. 1.2(e)(v); see also *In the Matter of Gadda* (Review Dept. 2002) 4 Cal. State Bar Ct. Rptr. 416, 443; *In the Matter of Riordan* (Review Dept. 2007) 5 Cal. State Bar Ct. Rptr. 41, 50; cf., *In the Matter of Johnson* (Review Dept. 2000) 4 Cal. State Bar Ct. Rptr. 179, 190 [credit for stipulating to facts but "very limited" where culpability is denied].)

**Emotional Difficulties**

As previously noted, extreme emotional difficulties may be considered mitigating where it is established by expert testimony that they were responsible for the attorney's misconduct. (Std. 1.2(e)(iv).)  Like her husband, Respondent Jaroscak offered testimony and evidence that she has suffered from stress and depression in the past and that she has sought assistance from LAP since August 2006.

The evidence offered by Respondent Jaroscak regarding the emotional difficulties she had in the past did not provide clear and convincing evidence that her problems are a mitigating factor here.  There was no expert testimony, or other convincing evidence, showing the required nexus between Respondent's claimed emotional problems and her misconduct.  Nor was there

sufficient evidence for this court to conclude that any emotional problems suffered by her in the past have now been satisfactorily resolved.

### Pro Bono/Community Service

Respondent Jaroscak testified that she had expended considerable time assisting in mock trial competitions. For these efforts, she is entitled to some mitigation credit.

### Character Evidence

Although there was some favorable evidence provided regarding Respondent Jaroscak's character, the evidence did not come from "a wide range of references in the legal and general communities and who are aware of the full extent of the member's misconduct." (Std. 1.2(e)(vi).) The court accords Respondent Jaroscak only nominal mitigation credit for this evidence.

## DISCUSSION

The purpose of State Bar disciplinary proceedings is not to punish the attorney but to protect the public, the courts, and the legal profession; to maintain the highest possible professional standards for attorneys; and to preserve public confidence in the legal profession. (Std. 1.3; *Chadwick v. State Bar* (1989) 49 Cal.3d 103, 111.)

In determining the appropriate level of discipline, this court looks first to the standards for guidance. (*Drociak v. State Bar* (1991) 52 Cal.3d 1095, 1090; *In the Matter of Koehler* (Review Dept. 1991) 1 Cal. State Bar Ct. Rptr. 615, 628.) The court then looks to the decisional law. (*Snyder v. State Bar* (1990) 49 Cal.3d 1302, 1310-1311; *In the Matter of Taylor* (Review Dept. 1991) 1 Cal. State Bar Ct. Rptr. 563, 580.) As the Review Department noted more than 18 years ago in *In the Matter of Bouyer* (Review Dept. 1991) 1 Cal. State Bar Ct. Rptr. 404, 419, even though the standards are not be applied in a talismanic fashion, they are to be followed unless there is a compelling reason that justifies not doing so. (Accord, *In re Silverton* (2005) 36 Cal.4th 81, 91; *Aronin v. State Bar* (1990) 52 Cal.3d 276, 291.) Ultimately, in determining the

appropriate level of discipline, each case must be decided on its own facts after a balanced consideration of all relevant factors.  (*Connor v. State Bar* (1990) 50 Cal.3d 1047, 1059; *In the Matter of Oheb* (Review Dept. 2006) 4 Cal. State Bar Ct. Rptr. 920, 940.)

**_Respondent Oxman_**

Standard 1.6(a) provides that, when two or more acts of misconduct are found in a single disciplinary proceeding and different sanctions are prescribed for those acts, the recommended sanction is to be the most severe of the different sanctions.  In the present proceeding, the most severe sanction for Respondent's misconduct is found in standard 1.7(b), which provides that when an attorney has two prior records of discipline, the degree of discipline in the current proceeding is to be disbarment unless the most compelling mitigating circumstances clearly predominate.  Notwithstanding its unequivocal language to the contrary, disbarment is not mandated under standard 1.7(b) even if there are no compelling mitigating circumstances that predominate in a case.  (*Conroy v. State Bar* (1991) 53 Cal.3d 495, 506-507, citing *Arm v. State Bar* (1990) 50 Cal.3d 763, 778-779, 781.)  That is because the ultimate disposition of the charges varies according to the proof.  (*In the Matter of Tady* (Review Dept. 1992) 2 Cal. State Bar Ct. Rptr. 121, 125.)

Although this court agrees with the State Bar that substantial discipline is warranted for Respondent Oxman , the court does not conclude that the misconduct by Respondent Oxman here, together with the history of his prior disciplines, make it necessary or appropriate that he be disbarred.  Instead, it is this court's conclusion and recommendation that Respondent Oxman should be suspended for three years; that execution of that suspension be stayed; and that Respondent be placed on probation for three years, with the condition, *inter alia*, that Respondent be actually suspended from the practice of law for the first two years of probation and until he provides proof to the satisfaction of the State Bar Court of his rehabilitation, present

fitness to practice, and present learning and ability in the general law pursuant to standard 1.4(c)(ii).

### *Respondent Jaroscak*

The most severe standards applicable to the misconduct of Respondent Jaroscak are standards 2.2(b) and 2.3.  Standard 2.2(b) provides: "Culpability of a member of commingling of entrusted funds or property with personal property or the commission of another violation of rule 4-100, Rules of Professional Conduct, none of which offenses result in the wilful misappropriation of entrusted funds or property shall result in at least a three month actual suspension from the practice of law, irrespective of mitigating circumstances."  Standard 2.3, provides: "Culpability of a member of an act of moral turpitude, fraud, or intentional dishonesty toward a court, client or another person or of concealment of a material fact to a court, client or another person shall result in actual suspension or disbarment depending upon the extent to which the victim of the misconduct is harmed or misled and depending upon the magnitude of the act of misconduct and the degree to which it relates to the member's acts within the practice of law."

Although Respondent Jaroscak has the benefit of significant mitigation credit for her years of discipline-free practice, that mitigation credit is more than offset by the serious nature of her misconduct, the long period of time during which it occurred, the substantial harm that her misconduct caused the beneficiaries of the Quatrochi Family Trust, her failure to respond to or cooperate with the State Bar, her general lack of remorse, and her lack of candor with this court. Under such circumstances, this court recommends that she be suspended for two years; that execution of that suspension be stayed; and that she be placed on probation for two years, with the condition, *inter alia*, that she be actually suspended from the practice of law for the first

eighteen (18) months of her probation.  (See *Rhodes v. State Bar* (1989) 49 Cal.3d 50, 61; *In the Matter of Broderick* (Review Dept. 1994) 3 Cal. State Bar Ct. Rptr. 138.)

**RECOMMENDED DISCIPLINE**

**Actual Suspension – Respondent Oxman**

It is recommended that **RICKEY BRIAN OXMAN**, member no. 72172, be suspended from the practice of law for three years; that execution of that suspension be stayed; and that Respondent be placed on probation for three years, with the following conditions:

1.     Respondent must be actually suspended from the practice of law for the first two years of probation and until he provides proof to the satisfaction of the State Bar Court of his rehabilitation, present fitness to practice, and present learning and ability in the general law pursuant to standard 1.4(c)(ii).

2.     Respondent must comply with the provisions of the State Bar Act, the Rules of Professional Conduct, and all the conditions of this probation.

3.     Respondent must maintain, with the State Bar's Membership Records Office and the State Bar's Office of Probation, his current office address and telephone number or, if no office is maintained, an address to be used for State Bar purposes.  (Bus. & Prof. Code, § 6002.1, subd. (a).)  Respondent must also maintain, with the State Bar's Membership Records Office and the State Bar's Office of Probation, his current home address and telephone number.  (See Bus. & Prof. Code, § 6002.1, subd. (a)(5).)  Respondent's home address and telephone number will not be made available to the general public.  (Bus. & Prof. Code, § 6002.1, subd. (d).)  Respondent must notify the Membership Records Office and the Office of Probation of any change in any of this information no later than 10 days after the change.

4.      Respondent must report, in writing, to the State Bar's Office of Probation no later than January 10, April 10, July 10 and October 10 of each year, or part thereof, in which Respondent is on probation (reporting dates).[9]  However, if Respondent's probation begins less than 30 days before a reporting date, Respondent may submit the first report no later than the second reporting date after the beginning of his probation.  In each report, Respondent must state that it covers the preceding calendar quarter or applicable portion thereof and certify by affidavit or under penalty of perjury under the laws of the State of California as follows:

>      (a) in the first report, whether Respondent has complied with all the provisions of the State Bar Act, the Rules of Professional Conduct, and all other conditions of probation since the beginning of probation; and
>
>      (b) in each subsequent report, whether Respondent has complied with all the provisions of the State Bar Act, the Rules of Professional Conduct, and all other conditions of probation during that period.

During the last 20 days of this probation, Respondent must submit a final report covering any period of probation remaining after and not covered by the last quarterly report required under this probation condition.  In this final report, Respondent must certify to the matters set forth in subparagraph (b) of this probation condition by affidavit or under penalty of perjury under the laws of the State of California.

5.      Subject to the proper or good faith assertion of any applicable privilege, Respondent must fully, promptly, and truthfully answer any inquiries of the State Bar's Office of Probation that are directed to Respondent, whether orally or in writing, relating to whether Respondent is complying or has complied with the conditions of this probation.

---

[9] To comply with this requirement, the required report, duly completed, signed and dated, <u>must be received</u> by the Office of Probation on or before the reporting deadline.

6.      Within one year after the effective date of the Supreme Court order in this matter,
        Respondent must attend and satisfactorily complete the State Bar's Ethics School and the
        State Bar's Client Trust Accounting School and provide satisfactory proof of such
        completion to the State Bar's Office of Probation.  This condition of probation is separate
        and apart from Respondent's California Minimum Continuing Legal Education (MCLE)
        requirements; accordingly, Respondent Oxman is ordered not to claim any MCLE credit
        for attending and completing this course.  (Rules Proc. of State Bar, rule 3201.)

7.      Respondent's probation will commence on the effective date of the Supreme Court order
        imposing discipline in this matter.

**Actual Suspension – Respondent Jaroscak**

It is recommended that **MAUREEN PATRICIA JAROSCAK**, member no. 117677, be
suspended from the practice of law for two years; that execution of that suspension be stayed;
and that Respondent be placed on probation for two years, with the following conditions:

1.      Respondent must be actually suspended from the practice of law for the first eighteen
        (18) months of probation.

2.      Respondent must comply with the provisions of the State Bar Act, the Rules of
        Professional Conduct, and all the conditions of this probation.

3.      Respondent must maintain, with the State Bar's Membership Records Office and the
        State Bar's Office of Probation, her current office address and telephone number or, if no
        office is maintained, an address to be used for State Bar purposes.  (Bus. & Prof. Code, §
        6002.1, subd. (a).)  Respondent must also maintain, with the State Bar's Membership
        Records Office and the State Bar's Office of Probation, her current home address and
        telephone number.  (See Bus. & Prof. Code, § 6002.1, subd. (a)(5).)  Respondent's home
        address and telephone number will not be made available to the general public.  (Bus. &

Prof. Code, § 6002.1, subd. (d).)  Respondent must notify the Membership Records Office and the Office of Probation of any change in any of this information no later than 10 days after the change.

4.     Respondent must report, in writing, to the State Bar's Office of Probation no later than January 10, April 10, July 10 and October 10 of each year, or part thereof, in which Respondent is on probation (reporting dates).[10]  However, if Respondent's probation begins less than 30 days before a reporting date, Respondent may submit the first report no later than the second reporting date after the beginning of her probation.  In each report, Respondent must state that it covers the preceding calendar quarter or applicable portion thereof and certify by affidavit or under penalty of perjury under the laws of the State of California as follows:

> (a) in the first report, whether Respondent has complied with all the provisions of the State Bar Act, the Rules of Professional Conduct, and all other conditions of probation since the beginning of probation; and

> (b) in each subsequent report, whether Respondent has complied with all the provisions of the State Bar Act, the Rules of Professional Conduct, and all other conditions of probation during that period.

During the last 20 days of this probation, Respondent must submit a final report covering any period of probation remaining after and not covered by the last quarterly report required under this probation condition.  In this final report, Respondent must certify to the matters set forth in subparagraph (b) of this probation condition by affidavit or under penalty of perjury under the laws of the State of California.

---

[10] To comply with this requirement, the required report, duly completed, signed and dated, must be received by the Office of Probation on or before the reporting deadline.

5.     Subject to the proper or good faith assertion of any applicable privilege, Respondent must fully, promptly, and truthfully answer any inquiries of the State Bar's Office of Probation that are directed to Respondent, whether orally or in writing, relating to whether Respondent is complying or has complied with the conditions of this probation.

6.     Within one year after the effective date of the Supreme Court order in this matter, Respondent must attend and satisfactorily complete the State Bar's Ethics School and the State Bar's Client Trust Accounting School and provide satisfactory proof of such completion to the State Bar's Office of Probation.  This condition of probation is separate and apart from Respondent's California Minimum Continuing Legal Education (MCLE) requirements; accordingly, Respondent is ordered not to claim any MCLE credit for attending and completing this course.  (Rules Proc. of State Bar, rule 3201.)

7.     Respondent's probation will commence on the effective date of the Supreme Court order imposing discipline in this matter.

**MPRE**

It is further recommended that both Respondent Oxman and Respondent Jaroscak each be ordered to take and pass the Multistate Professional Responsibility Examination during the period of their respective periods of actual suspension.  (See *Segretti v. State Bar* (1976) 15 Cal.3d 878, 891, fn. 8.)  Failure to do so may result in an automatic suspension.  (Cal. Rules of Court, rule 9.10(b).)

**Rule 9.20**

The court recommends that both Respondent Oxman and Respondent Jaroscak each be ordered to comply with rule 9.20 of the California Rules of Court, and perform the acts specified

in subdivisions (a) and (c) of that rule within 30 and 40 calendar days, respectively, after the effective date of the Supreme Court order in this matter.[11]

## Costs

It is further recommended that costs be awarded to the State Bar in accordance with section 6086.10 and that such costs be enforceable both as provided in section 6140.7 and as a money judgment.  It is also recommended that each respondent be ordered to reimburse the Client Security Fund to the extent that the misconduct in this matter results in the payment of funds and that such payment obligation be enforceable as provided for under Business and Professions Code section 6140.5.


Dated:  March _____, 2011                          _____
                                                   DONALD F. MILES
                                                   Judge of the State Bar Court

---

[11] Each respondent is required to file a rule 9.20(c) affidavit even if he/she has no clients to notify on the date the Supreme Court files its order in this proceeding.  (*Powers v. State Bar* (1988) 44 Cal.3d 337, 341.)  In addition to being punished as a crime or contempt, an attorney's failure to comply with rule 9.20 is also, *inter alia*, cause for disbarment, suspension, revocation of any pending disciplinary probation, and denial of an application for reinstatement after disbarment.  (Cal. Rules of Court, rule 9.20(d).)

# DECLARATION OF KARLENE W. GOLLER

## <u>DECLARATION OF KARLENE W. GOLLER</u>

I, Karlene W. Goller, declare:

1.      I am an attorney admitted to practice before all the courts of the State of California and before this Court.  I am in-house counsel for Los Angeles Times Communications LLC, and I am one of the attorneys representing the Times in this matter.  The facts stated below are true of my own personal knowledge, and, if called to testify, I could and would competently testify to these facts.

2.      I was present at the hearing on the Times defendants' motion to strike a defamation lawsuit filed by Michael Omidi, which took place on June 27, 2011. <u>Nothing</u> was said at or after that hearing about this pending federal lawsuit, nor did Mr. Silverman make any mention of his intent to file a Motion To Amend.  He immediately left the courtroom after Judge Solner granted the Motion To Strike, and did not engage in any conversation whatsoever with me or with Kelli Sager following the hearing.

3.      I also was present at the hearing on the Times defendants' motion to strike a defamation lawsuit filed by Julian Omidi, which took place on June 29, 2011.  There was nothing said before or during that hearing about this federal lawsuit, nor was there any mention made of Mr. Silverman's intent to file a Motion To Amend.

4.      Following the hearing, Ms. Sager and I talked outside the courtroom for a few minutes; Mr. Silverman and Mr. Oxman did not approach us, nor was anything said in my presence about the federal lawsuit, or about any motion to amend in the federal action.

5.      Although I am counsel of record in this lawsuit, neither Mr. Silverman nor Mr. Oxman said anything to me at any time about the substance of a motion to amend the complaint, or about the federal lawsuit.

6.      Mr. Silverman's assertions about the Times defendants' request for continuance being related in some convoluted way to bankruptcy proceedings

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

involving the Times is entirely false (and makes no sense, given that the filing of the Motion To Amend is already a matter of public record, and has no bearing on the bankruptcy proceedings in any event).

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct, and that this Declaration was executed on the 6th day of July, 2011, in Los Angeles, California.

Karlene W. Goller

DECLARATION OF KARLENE W. GOLLER
DWT 17552068v1 0026175-000388

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST. SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899