**SILVERMAN & ASSOCIATES**
**ROBERT B. SILVERMAN SBN 170517**
**25 S. OAK KNOLL AVE., SUITE 504**
**PASADENA, CA 91101**
**TEL: (626) 529-4202**
**FAX: (888) 308-5099**
**EMAIL: SILVERATTY@GMAIL.COM**

**ATTORNEYS FOR PLAINTFF**

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| 1 800 GET THIN, LLC | Case Number: CV11-0505-ODW (Ex) |
| Plaintiff, | Assigned: HON. OTIS D. WRIGHT, II |
| vs. | **PLAINTIFF'S REPLY TO THE DEFENDANTS' OPPOSITION TO THE MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT** |
| Michael Hiltzik, an individual; Los Angeles Times Communications, LLC; Stuart Pfeifer, an individual; etc., et al.; | [Fed. R. Civ. P 15] |
| Defendants | Hearing Date: August 1, 2011<br>Time:            1:30 PM<br>Courtroom:    11 –Spring Street |
| | Action Filed: January 18, 2011 |

Plaintiff, 1 800 GET THIN submits this Reply Brief in Support of its Motion for Leave to File Second Amended Complaint.

# TABLE OF CONTENTS

I. SUMMARY ........................................................................... 1

II. GOOD CAUSE EXISTS FOR THE COURT SHOULD GRANT
   LEAVE TO AMEND ........................................................... 2

   A. Legal Standard for Leave to Amend .................................. 2

      1. 1 800 GET THIN has not engaged in any bad faith
        conduct ................................................................. 3

        a. Defendants' claims of bad faith lack foundation ........ 3

        b. Defendants' authorities do not support their position ... 4

      2. 1 800 GET THIN has not engaged in undue delay ........... 6

        a. Defendants' concealed their conspiracy ................. 6

        b. Defendants' authorities do not support their
        position ............................................................. 7

      3. There is no prejudice to defendant in granting leave to
        amend .................................................................. 8

      4. The prior amendment should not preclude a new
        amendment .......................................................... 9

      5. 1 800 GET THIN's amendment is not futile ................... 10

        a. 1 800 GET THIN's Complaint states valid claims ..... 10

III. 1 800 GET THIN HAS STATED CLAIMS FOR VIOLATION OF
    THE SHERMAN ACT, LANHAM ACT, AND RICO ................... 11

   A. 1800 GET THIN has stated a claim under the Sherman Act ........ 11

      1. Defendants are not engaged in protected activity .............. 11

      2. The First Amendment does not protect defendants'
        conduct ................................................................. 12

      3. Defendants have overstepped First Amendment
        protections ............................................................ 15

4.  1 800 GET THIN's Complaint meets all pleading

standards ………………………………………….. 16

5.  1800 GET THIN alleges injury to competition …………... 17

6. 1 800 GET THIN has properly alleged the relevant

market …………………………………………….. 18

7.  The Complaint alleges injures to competition …………….. 20

B.  1 800 GET THIN has properly alleged a Lanham Act violation ... 21

C.  1 800 GET THIN has Properly Stated a Claim under RICO …… 22

1.  The Complaint alleges wire fraud, mail fraud, and

extortion ……………………………………….. 22

2.  1 800 GET THIN has alleged a RICO the "enterprise" ….. 23

3.  1 800 GET THIN has alleged a pattern of racketeering ….. 24

IV.  CONCLUSION ………………………………………….. 25

CERTIFICATE OF SERVICE ……………….……….…..……………. 26

1

## **TABLE OF CASES**

2  Acri v. International Ass'n of Machinists & Aerospace Workers, 781

3          F.2d 1293 (9th Cir. 1986) ............................................................ 8

4  American Ad. Management, Inc. v. General Telephone Co., 190 F.3d

5          1051 (9th Cir. 1999) ................................................................ 17

6  Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328 (1990) .............. 17

7  Balistreri v. Pac. Police Dept., 901 F. 2d 696, 699 (9th Cir. 1990) .................. 9

8  Barnes v. Geln Theater, Inc., 501 U.S. 560 (1991) ................................... 13

9  Bell Atlantic Corp. v. Twombley, 550 U.S. 544 (2007) ........................... 16

10  Boerstler v. American Medical Assn, 16 F.R.D. 437 (N.D. Ill 1954) ........... 17

11  Brunswick Co. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 447 (1977) .............. 21

12  California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972) ... 13

13  Cedrick Kushner Promotions, Ltd. v. King, 533 U.S. 158 (2001) ................. 25

14  Chodos v. West Publishing Co., 292 F.3d 992 (9th Cir. 2002) .............. 4, 5

15  Citizen Publishing Co. v. United States, 395 U.S. 131 (1969) .................... 13

16  Coastal Abstract Serv., Inc. v. First American Title Co., 173 F.3d

17          725 (9th Cir. 1999) ................................................................. 16

18  Cohen v. Cowles Media Co., 501 U.S. 663 (1991) ................................. 13

19  Cost Management Servs., Inc. v. Washington Nat'l Gas Co., 99 F.3d 937

20          (9th Cir. 1996) ...................................................................... 17

21  DCD Programs, Ltd. v. Leighton, 833 F.2d 183 (9th Cir. 1987) .................. 2

22  Dr. Seuss Ent., LP v. Penguin Books, USA, 109 F.3d 1394 (9th Cir. 1997) ... 22

23  E.E.O.C. v. Boeing, 843 F.2d 1213 (9th Cir.), cert. denied, 488 U.S.

24          889 (1988) .......................................................................... 6

25  E.& J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280 (9th Cir. 1992) ......... 22

26  Eminence Capital, LLC. v. Aspon, 316 F.3d 1048 (9th Cir. 2003) ............... 8

27  Friedman v. Rogers, 440 U.S. 1 (1979) ............................................. 22

28  F.T.C. v. Superior Court Trial Lawyers Ass'n, 493 U.S. 411 (1990) ............ 12

1   Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974) ..................................   6

2   Gibony v. Empire Storage & Ice. Co., 336 U.S. 490 (1949) ......................   12

3   Gordon & Breach Sci. Pub., SA v. American Inst. of Physics, 859 F.

4       Supp. 1521 (S.D.N.Y 1964) ...................................................   16

5   Grigges v. Pace Am. Group, Inc., 170 F.3d 877 (9th Cir. 1999) ..................   9

6   Hayes v. New England Millworks Distrib., Inc., 602 F.2d 15 (1st

7       Cir. 1979) ...........................................................................   6

8   H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989) ....................   24

9   In re Mavety Media Group, Ltd., 33 F.3d 1367 (Fed. Cir. 1994) ..................   22

10  Interstate Circuit, Inc. v. United States, 306 U.S. 208 (1939) ....................   12

11  Jackson v. Bank of Hawaii, 902 F.2d 1385 (9th Cir. 1990) ........................   7

12  Jordan v. County of Los Angeles, 669 F.2d 1311 (9th Cir.), vacated on ,

13      other grounds, 459 U.S. 810 (1982) ....................................   6, 7

14  Leatherman v. Terrant, City Narcotics Intelligence & Coordination

15      Unit, 507 U.S. 163 (1993) ...................................................   18

16  Loehr v. Ventura County College Dist., 743 F.2d 1310 (9th Cir. 1984) ..........   6

17  Miami Herald Pub. Co. v. Tornillo, 418 U.S. 241 (1974) .........................   15

18  Mikovich v. Lorain Journal Co., 497 U.S. 1 (1990) ...............................   6

19  Morongo Band of Mission Indians v. Rose, 893 F.2d 1074 (9th Cir.

20      1990) ...............................................................................   7, 8

21  National Organization for Women, Inc. v. Scheidler, 510 U.S. 249 (1994) ...   23

22  National Society of Professional Engineers v. United States, 435 U.S.

23      679 (1978) .........................................................................   13

24  Netbulla LLC. v. Distinct Corp., 212 F.R.D. 534 (N.D. Cal. 2003) ..............   11

25  Newspaper Printing Corp. v. Galbreath, 580 S.W. 2d 777 (Tenn.), cert.

26      denied, 444 U.S. 870 (1979) .............................................   15, 16

27  Newman v. Universal Pictures, 15 F.3d 1519 (9th Cir. 1987), cert. denied,

28      486 U.S. 1059 (1988) ..........................................................   17

1    Nunes v. Ashcroft, 438 F.3d 815 (9th Cir. 2003) .................................... 2

2    Oltz v. St. Peters Community Hosp., 861 F.2d 1440 (9th Cir. 1988) .......... 18

3    Oregon Nat'l Resources Council v. Mohla, 944 F.3d 531 (9th Cir. 1991) ....... 12

4    SAES Jetters S.P.A. v. Aeronex, Inc., 219 F. Supp.2d 1081 (S.D.

5         Cal. 2002) ........................................................................... 11

6    Sedima S.P.R.L. v. Imrex Co., 473 U.S. 479 (1985) ............................... 23

7    Seville Indus. Machinery Corp. v. Southmost Machinery Corp., 742 F.2d

8         786 (3d Cir. 1984) ................................................................. 23

9    Sorosky v. Burroughs Corp., 826 F.2d 794 (9th Cir. 1987) ....................... 3

10   Summit Properties, Inc. v. Hoechst Celanese Corp., 214 F.3d 556 (5th

11        Cir. 2000) ............................................................................ 25

12   Tanaka v. University of So. Cal., 252 F.3d 1059 (9th Cir. 2001) .................. 19

13   Times-Picayune Pub. Co., 345 U.S. 594 (1953) .................................... 18

14   Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622 (1994) ............................. 13

15   United States v. Philip Morris, USA, Inc., 566 F.3d 1095 (D.C. Cir.

16        2009), cert. denied, 130 S.Ct. 3501 (2010)............................ 13, 14

17   United States v. City of Redwood City, 640 F.2d 963, 966 (9th Cir. 1981) ........ 9

18   United States v. Turkette, 452 U.S. 576 (1981) .................................. 24

19   United States v. Webb, 655 F.2d 977 (9th Cir. 1981) .......................... 1, 10

20   Virginia Pharmacy Board v. Virginia Citizens Consumer Council, 425

21        U.S. 748 (1976) ..................................................................... 22

22   World of Faith World Outreach Center Church v. Sawyer, 9 F.3d 118 (5th

23        Cir. 1996) ........................................................................... 24

24   Whelan v. Abell, 48 F.3d 1247 (D.C. Cir. 1995) .................................. 12

25   Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100 (1969) .......... 17

26                        **TABLE OF SECONDARY AUTHORITIES**

27   2 W. Schwarzer, A. Tashima & M. Wagstaffe, California Practice

28        Guide – Federal Civil Procedure Before Trial (2010) ...................... 11

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## SUMMARY

This is a simple Motion for Leave to Amend to file a Second Amended Complaint in accordance with Federal Rules of Civil Procedure (F.R.C.P.) Rule 15. The amendment of pleadings should be liberally granted. In this case, there has not even been a scheduling order. An amendment at this stage would not be prejudicial to the Defendants. The 9th Circuit routinely holds that such an administrative act of allowing an amendment should be liberally and freely granted. [United States v. Webb, 655 F.2d 977, 979 (9th Cir. 1981)("the rule allowing leave to amend should be interpreted with "extreme liberality.")]

In response, Defendants claim 1 800 GET THIN is "desperate" to keep this lawsuit alive and has filed "yet another amended Complaint" (Defendant's Memo, p. 1, lines 1-8) It is the actions of the Defendants that illustrate how desperate they are to keep hiding their bad acts.

In recap, Defendants and their counsel filed a 45 page Ex Parte Application in direct violation of Local Rule 7-19 and 7-19.1, among other defects, claiming they would not have sufficient time to file a timely Opposition. However, nowhere in the Application or their reply did they explain why they needed a continuance. Notwithstanding, the Defendants filed a 42 page timely Opposition. Clearly the Defendants were less then truthful.

It was also Defendants and their Counsel who attempted to deceive this Court by submitting sanitized published articles such that any and all advertising, which is the issue of this lawsuit, was completely removed. The Defendants and their counsel did not want this Court to see competitor's advertising that was subsequently embedded directly in the middle of the article. It was the intent of the Defendants to deceive this Court so that they could simply continue with their anti-competitive actions.

Nor should the Court ignore the fact that Defendants created the "advertorial" and "infomercial" "protection" scheme. These are not the acts of the Plaintiff 1 800 GET THIN. It was Defendants who require advertisers to pay "premiums" to exclusively advertise in targeted articles which were directed against their competitors. Defendants' enforced their scheme against those who refused to pay with relentless printed attacks. Anyone who paid "protection" received "immunity" from attack. Then when Plaintiff conceded, the Defendants, attempted to charge two (2) and three (3) times normal advertising rates.

It is alleged that this conspiracy was created in order to finance the Defendants' bankruptcy and staggering debt. The Amended Complaint clarifies Plaintiff's position with regard to the Defendants. The Amended Complaint is timely and non-prejudicial. Any claim of prejudice should be disregarded as the Defendants' and their counsel have been extremely deceitful before this Court.

The Court should grant the Motion for Leave to Amend.

## II.

## GOOD CAUSE EXISTS FOR THE COURT TO GRANT LEAVE TO AMEND

### A. Legal Standard for Leave to Amend

There are five (5) factors in determining the propriety of a motion for leave to amend: (1) the absence of bad faith; (2) absence of undue delay; (3) absence of prejudice to the opposing party, (4) whether plaintiff has previously amended the complaint, and (5) futility of amendment. [Nunes v. Ashcroft, 438 F.3d 815, 818 (9th Cir. 2003)] The factors are not weighted equally, and a showing of delay alone usually will not justify denial of leave to amend. [DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 186 (9th Cir. 1987)(no undue delay where party moved for leave fourteen months after initial complaint)]

Each of these factors indicates 1 800 GET THIN's amendment is appropriate. 1 800 GET THIN filed its original Complaint on January 18, 2011, and amended on March 31, 2011to add Stuart Pfeifer and the Los Angeles Times

-- 2 --                Reply - Motion to file Second
                                                                    Amended Complaint

as Mr. Hiltzik was taken off of the case and replaced by Mr. Pfeifer in a concerted organized corporate approved attack on the Plaintiff.

While Defendants filed a Motion to Dismiss on April 25, 2011, there has been no delay, no discovery proceedings, no rulings from the court, and no events which would prejudice Defendants. The events which brought to light the new facts occurred on April 25, 2011, when Defendants' counsel concealed the anticompetitive "advertisements" from this Court in their Court papers. 1 800 GET THIN then investigated and determined defense counsel's egregious conduct was the product of a Chicago Style protection scheme to restrain trade and punish any advertiser who refused to pay Defendants' advertising premiums.

### 1. **1 800 GET THIN has not engaged in any bad faith conduct**
#### a. **Defendants' claims of bad faith lack foundation**

Defendants accuse 1 800 GET THIN of "bad faith" in filing a request for leave to amend to assert what Defendants call "nonsensical" theories in an amended complaint not contained in their original complaint. (Defendants' Memo, p. 7, lines 11-14) However, there not one scrap of evidence of "bad faith" presented by the Defendants and none can be demonstrated. As noted, the only documented bad faith in this litigation is by the Defendants and their counsel in an attempt to deceive the Court with numerous false statements and documents.

Bad faith in a motion for leave to amend exists where a party undertakes improper tactics in the course of litigation, such as adding a party to destroy diversity jurisdiction. [Sorosky v. Burroughs Corp., 826 F. 2d 794, 805 (9th Cir. 1987)] 1 800 GET THIN has engaged in no such tactics. Rather, it has proposed an amended complaint when it discovered facts which demonstrated Defendants' Chicago Style "protection" scheme.

Defendants argue "Plaintiff provides no explanation whatsoever for its failure to assert these 'newly discovered' claims in either of its two prior complaints, or at any time in the last year." (Defendants' Memo, p. 2, lines `-3)

However, it was Defendants' counsel's blatant conduct of April 25, 2011, in erasing the advertising from the exhibits she submitted to this Court which brought to light the conspiracy to have "infomercials" instead of "articles" which attacked 1 800 GET THIN. It was the "advertorial" articles of May 6, 2011, and June 11, 2011, which demonstrated the conspiracy to force advertisers to pay a "premium" to Defendants Times at the risk of being attacked should they refuse. This was confirmed when a Southern California patient died from a Lap-Band surgery in Mexico at a Hospital that advertises with the Defendants. While the Defendants have authored over 15 articles, about the Plaintiff and Lap-Band, since December 2010, the Defendants failed to write one single article about the death of a patient at a Mexican Hospital. It is not a coincidence that this Mexican Hospital is an advertiser with the Defendants.

1 800 GET THIN investigated and verified Defendants' "protection" scheme following April 25, 2011, and filed its amendment on July 1, 2011. There has been no delay, no undue passage of time, and no prejudice of any kind to Defendants. Nor could there be because Defendants' anticompetitive scheme to hide their conspiracy to run a "protection" scheme with advertisers has continued through June 11, 2011, and it is another act of deceit for the Defendants to claim delay from June 11, 2011, to the filing of the July 1, 2011, request for leave, a period of 19 days.

Nevertheless, Defendants argue the Complaint is based on "facts that have been known to plaintiff for more than a year." (Defendants' Memo, p. 2, line 7). The accusation defies logic, merit, and factual support. Defendants engaged in a hidden conspiracy which only became obvious when Defendants' counsel furthered the conspiracy in an attempted "cover up" on April 25, 2011.

CV11-0505-ODW (Ex)                    -- 4 --         Reply - Motion to file Second
                                                     Amended Complaint

## b. **Defendants' authorities do not support their position**

Defendants cite Chodos v. West Publishing Co., 292 F. 3d 992 (9th Cir. 2002), for the proposition that motion for leave may be denied when it causes undue delay, bad faith, prejudice, or is a dilatory tactic. (Defendants' Memo, p. 14)

However, in Chodos, a lawyer brought suit against a legal publisher claiming breach of a publication contract where Defendants refused to publish. The case was filed in State Court, Removed to Federal Court by Defendant and Plaintiff filed a MSJ which was denied. Defendants then filed a Rule 12(b)(6) Motion to Dismiss which was denied. The Plaintiff then amended to drop the breach of contract claim and substitute Quantum Meruit.

The case then proceeded through the Discovery phase. At the end of all discovery the Defendant moved for summary judgment. Plaintiff opposed the motion and sought leave to amend the complaint to allege fraud asserting it was based upon "new" facts. The District Court denied leave and granted summary judgment. The Ninth Circuit reversed the summary judgment order but confirmed the denial of leave to amend. [Id. at 1002] The 9th Circuit found that it was not an abuse of discretion for the District Court to deny leave to amend because the "new" facts were available to plaintiff when he filed his previous amendment asserting "quantum meruit." Further, plaintiff failed to explain the "delay" until discovery was completed. [Id.] This case is inapplicable, because the Plaintiff sought to amend the Complaint at the conclusion of the Discovery phase and when the Defendant had filed a Motion for Summary Judgment. Neither is applicable in this case. This pending case has not even had a scheduling order issued by the Court.

More importantly, Plaintiff has demonstrated why there are new facts and the discovery of the new facts. Counsel on April 25, 2011 hid the advertising and Stuart Pfeifer last wrote on June 11, 2011. Both of these acts could not have been discovered prior to the filing of the First Amended Complaint.

## 2.  1 800 GET THIN has not engaged in undue delay

### a.  Defendants' concealed their conspiracy

Defendants submit the declaration of Attorney Kelli Sager claiming 1 800 GET THIN knew of Defendants' conduct as long ago as Spring of 2010, when its counsel sent letters to Defendants complaining of their columns.  (Sager Dec., p. 1, lines 10-13; Defendants' Memo, p. 4, line 17, to p. 5, line 1)  Nowhere in any of those letters does it state that Plaintiff knew or accused the Los Angeles Times of conspiring with advertisers.  However, the Declaration further ignores the hidden conspiracy of April 25, 2011, when Attorney Sager attempted to deceive this Court by expunging, erasing, and extinguishing the advertisers from the articles she submitted to the Court.

In determining undue delay for leave to amend the court should determine if plaintiffs knew or should have known of the facts and theories when they filed their original pleading. [E.E.O.C. v. Boeing Co., 843 F.2d 1213, 1222 (9th Cir.), cert. denied., 488 U.S. 889 (1988)]  Where a party knows the facts which form the basis of a requested amendment, delay in asserting those facts should be explained. [Jordan v. County of Los Angeles, 669 F.2d 1311, 1324 (9th Cir.), vacated on other grounds, 459 U.S. 810 (1982)]  Undue delay, while relevant to the considerations of permitting leave to amend, is not enough alone to deny leave. [Loehr v. Ventura County Community College Dist., 743 F.2d 1310, 1319-20 (9th Cir. 1984)]  Undue delay does not occur until at least the completion of discovery and the passage of significant time. [Hayes v. New England Millworks Distrib., Inc., 602 F.2d 15, 20 (1st Cir. 1979)("undue delay" exists where movant fails to ask to amend two years and after discovery closed)]

Defendants fail to provide one single scrap of evidence that 1 800 GET THIN could have known about Defendants' hidden anticompetitive conspiracy prior to April 25, 2011, when Attorney Sager engaged in attorney misconduct and Mr. Pfeifer wrote his June 11, 2011 column.  This Court should recognize that it is

Attorney Sager who has become a part of the problem, and that she now comes before the Court with unclean hands and baseless accusations of "delay," "tenuous," and "desperate" for which she has failed to present supportive evidence. Attorney Sager submitted false and misleading Ex Parte Application before this Court in violation of Local Rule 7-19 and 7-19.1, only to withdraw the Ex Parte application after Plaintiff submitted a timely Response.

The Plaintiff has submitted a timely Motion for Leave to Amend. There has been no undue delay as the case has barely even gotten out of the starting gate. The Motion should be granted.

### b. Defendants authorities do not support their position.

Defendants cite Morongo Band of Mission Indians v. Rose, 893 F.2d 1074 (9th Cir. 1990), for the proposition "inordinate delay" justifies denial of leave to amend. (Defendants' Memo, p. 3, line 19, to p. 4, line 2)  However, in Morongo, Plaintiffs sought leave to amend to add RICO claims 2 years into the lawsuit and as part of a Motion for Reconsideration. "After the dismissal of its original complaint, and nearly two years after its filing, the Band moved for leave to file an amended complaint." The Motion was denied on various grounds.

None of the items referenced in the Morongo case are present in this litigation.

Defendants then cite Jackson v. Bank of Hawaii, 902 F. 2d 1385 (9th Cir. 1990), for the proposition leave to amend is not to be granted automatically. (Defendants' Memo, p. 3, lines 9-11)  However, in Jackson, the Court found prejudice because of the extensive discovery which had taken place in the case and the plaintiff failed to justify the delay in moving to file an amended complaint. [Id. at 1388]  The Court found that even accepting the Plaintiffs statements, they still waited over 8 months after discovery to file their Motion.

1    <u>Jackson</u> is unlike 1 800 GET THIN's proposed amendment because there
2    has been no discovery, Defendants' Chicago Style "protection" scheme was
3    hidden, and the May 6, 2011, and June 11, 2011, articles exposed the conspiracy.
4    Defendants cite <u>Acri v. International Ass'n of Machinists & Aerospace</u>
5    <u>Workers</u>, 781 F.2d 1293 (9th Cir. 1986), for the proposition late amendments to
6    assert new theories are disfavored when plaintiff knew of facts from the case
7    inception. (Defendants' Memo, p. 3, lines 15-18)  However, in <u>Acri</u>, Plaintiff
8    admitted that Plaintiffs delay in bringing the section 101 cause of action was a
9    tactical choice because he felt that the causes of action already stated were
10   sufficient.  The Court found that it was prejudicial in that if granted it would
11   require additional discovery and discovery had already closed and a MSJ was
12   pending.
13   Nothing in 1 800 GET THIN's case resembles <u>Acri</u>, as there has been no
14   discovery, no ruling, and no substantive proceedings in this case.
15   **3.  There is no prejudice to Defendants in granting leave to**
16   **amend.**
17   Defendants claim they were prejudiced by briefing a Motion to Dismiss
18   before 1 800 GET THIN sought leave to amend. (Defendants' Memo, p. 2, lines
19   10-13)  However, this was the same motion where defense counsel concealed the
20   advertisements which sponsored the "advertorials" attacking 1 800 GET THIN.
21   The only "prejudice" Defendants suffered was that their counsel exposed their
22   unlawful conduct in an effort to erase, expurgate, and extinguish the reality that
23   they had engaged in a conspiracy to run a "protection" scheme with advertisers.
24   Undue prejudice means substantial alteration of the litigation requiring
25   Defendants to undertake late hour discovery on new matters. [<u>Morongo Band of</u>
26   <u>Mission Indians v. Rose</u>, 893 F.2d 1074, 1079 (9th Cir. 1990)]  "Absent prejudice,
27   or a strong showing of any of the remaining ... factors, there exists a presumption
28   under Rule 15(a) in favor of granting leave to amend." [<u>Eminence Capital, LLC v.</u>

Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003)]  When a court conducts a Rule 15(a) analysis, generally all inferences should be drawn in favor of granting the motion. [Griggs v. Pace Am. Group, Inc., 170 F.3d 877, 880 (9th Cir. 1999)]

Defendants state, "Plaintiff's attempt to avoid having its case dismissed (and avoid a prospective fee award under the Lanham Act) by concocting new meritless legal theories that have no connection to the theory originally pleaded should be rejected." (Defendants' memo, p. 14-16)  However, Defendants have not once mentioned in their Memorandum a single fact, event, or substantive allegation of 1 800 GET THIN's Complaint.  Defendants' hyperbole lacks any analysis of the facts of the Complaint because those new facts demonstrate an anticipative conspiracy and repeated racketeering in a Chicago Style "protection" scheme.

Dismissal pursuant to Rule 12(b)(6) is proper only where there is either a "lack of cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." [Balistreri v. Pac. Police Dept., 901 F. 2d 696, 699 (9th Cir. 1990)]  It is only under extraordinary circumstances that dismissal is proper under Rule 12(b)(6).  [United States v. City of Redwood City, 640 F.2d 963, 966 (9th Cir. 1981)]  Therefore, there is no prejudice to the Defendants as in response to the Motion to Dismiss, the Court, in most instances should grant leave to amend. As the Second Amended Complaint illustrates, Plaintiff has plead a cognizable legal theory for which amendment would be warranted, even if the Court was inclined to grant the pending Motion to Dismiss.

### 4. The prior amendment should not preclude a new amendment

1 800 GET THIN filed an amendment to the Complaint on March 1, 2011, before it served the Complaint on Defendants.  The amendment added Stuart Pfeifer and Los Angeles Times Communications as a Defendant.  1 800 GET THIN did not know of the Chicago Style protection scheme at that time.  1 800 GET THIN could not reasonably have known about it until various acts following the filing of that amendment.

Because it was not until the May 6, 2011, and June 11, 2011, articles that 1 800 GET THIN realized the extent of the conspiracy. Once identified, it took additional time to investigate and research the legal claims. Further confirmation occurred on April 25, 2011 when Ms. Sager attempted to deceive the Court with sanitized articles deleting all of the advertising. The prior amendment of March 31, 2011, should not preclude 1 800 GET THIN from filing an amended Complaint. [United States v. Webb, 655 F.2d 977, 979 (9th Cir. 1981)(rule allowing leave to amend should be interpreted with "extreme liberality.")]

### 5. 1 800 GET THIN's amendment is not futile.

#### a. 1 800 GET THIN's Complaint states valid claims.

Defendants claim 1 800 GET THIN should not be permitted to amend its complaint because leave to amend would be futile. (Defendants' Memo, p. 7, line 21) However, 1 800 GET THIN has stated a valid claim under the Sherman Act, Lanham Act, and RICO, and nothing in Defendants' opposition addresses the facts of this case which are supported with the actual articles showing the anticompetitive "infomercials" which Defendants operate.

The Defendants Chicago Style "protection" scheme is supported by competitive advertisers who pay for "immunity" from the same attacks made against 1 800 GET THIN. Defendants ignore the documented allegations supported by the false and misleading articles.

Defendants fail to address the fact that when a patient dies at Angeles Hospital, Defendants say not one word about that death because Angeles Hospital advertises with Defendants, but where a patient has problem at a clinic associated with 1 800 GET THIN, Defendants publish a false and misleading "advertorial" attack sponsored by Angeles Hospital. Defendants cannot deny that when their advertisers have 11, 12, 15, 18, and 30 Joint Commission on Accreditation violations, they have sponsored anticompetitive "infomercial" attacks on 1 800

GET THIN, and there is not one word about the excessive violations of their advertising sponsors because they paid "protection" money for "immunity."

Judges Schwarzer, Tashima and Wagstaffe point out:

"Ordinarily, courts do not consider the validity of a proposed amended pleading in deciding whether to grant leave to amend. (Challenges to the pleading are usually deferred until after leave to amend is granted and the amended pleading filed.). [SAES Getters S.p.A. v. Aeronex, Inc. (SD CA 2002) 219 F.Supp.2d 1081, 1086 (citing text); Netbula, LLC. v. Distinct Corp. (N.D. CA 2003) 212 FRD 534, 549 (citing text)]" 2 W. Schwarzer, A. Tashgima, & M. Wagstaffe, California Practice Guide – Federal Civil Procedure Before Trial ¶8:1514, at 8-167 to -68 (2010).

The validity of a proposed amended complaint is not at issue when deciding whether or not to grant leave to amend. The validity of the complaint is to be considered only under a Motion pursuant to Rule 12. Defendants have, with their rambling 25 page Opposition, essentially filed a Rule 12 Motion which is inappropriate for a Rule 15 Motion. Defendants, if they so desire, should raise their meritless arguments in a properly Noticed Motion to Dismiss. The Motion for Leave to Amend should be granted.

## III.

## 1 800 GET THIN HAS STATED CLAIMS FOR VIOLATION OF THE SHERMAN ACT, LANHAM ACT, AND RICO.

### A. 1 800 GET THIN has stated a claim under the Sherman Act.

#### 1. Defendants are not engaged in protected activity.

Defendants claim the Complaint is "bereft of any specific facts" and does not meet the requisite pleading standards because Defendants are engaged in constitutionally protected speech." (Defendants' Memo, p. 2, line 19, to p. 3, line 1) However, the Complaint contains detailed facts, identify the time, date, place, and persons involved in the "protection" scheme, including the identity of each

advertiser, the fact they pay a premium through LA Times Links to sponsor the
"advertorial" attack against 1 800 GET THIN, and the fact that when they have
medical complications such as a death at their clinic as in the case of Sharona
Espudo on May 26, 2011, or Joint Commission on Accreditation for Health
Organizations (JCAHO) violations, they have bought themselves immunity from
exposure from Defendants Times' attacks against 1 800 GET THIN in the very
same "infomercial" articles.  There is no protected speech involved in these
"advertorial" and "infomercial" attacks because the "veil" of news articles does not
justify the advertising sponsorship of attacks against 1800 GET THIN, and the
First Amendment does not protect commercial anticompetitive falsity.

### 2. The First Amendment does not protect Defendants' conduct.

Defendants argue 1 800 GET THIN's Sherman Act claim is barred by the
First Amendment. (Defendants' Memo, p. 8, lines 7-10)  However, where
anticompetitive conspiracies use freedom of expression as a "pretext" or "sham" to
achieve their anticompetitive goals, the First Amendment provides no protection.
[FTC v. Superior Court Trial Lawyers Ass'n, 493 U.S. 411, 429-30 (1990)]
Invocation of the First Amendment to veil anticompetitive conduct constitutes a
"sham." [Giboney v. Empire Storage & Ice co., 336 U.S. 490, 502 (1949)
(anticompetitive conduct achieved through speaking, writing, or printed matter is
merely the mechanism by which the conspiratorial conduct occurs)]  Concerted
activity under the guise of an exercise of protected speech will not be permitted
when the goal is an anticompetitive economic result achieved for economic
reasons.  [Interstate Circuit, Inc. v. United States, 306 U.S. 208, 226 (1939)]

Where a Defendants' First Amendment activity amounts to a sham, the first
amendment provides no protection of such activity from antitrust regulation.
[Oregon Natural Resources Council v. Mohla, 944 F.2d at 5312, 534-35 (9th Cir.
1991)]  The First Amendment does not protect fraudulent speech. [Whelan v.
Abell, 48 F.3d 1247, 1255 (D.C. Cir. 1995)("However broad the First Amendment

right to petition may be, it cannot be stretched to cover petitions based on known falsehoods."; United States v. Philip Morris USA, Inc., 566 F.3d 1095, 1023 (D.C. Cir. 2009)("the First Amendment does not protect fraud.")]

In California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 515 (1972), the court stated:

> "First Amendment rights may not be used as the means or the pretext for achieving 'substantive evils' which the legislature has the power to control."

In National Society of Professional Engineers v. United States, 435 U.S. 679 (1978), the Court approved a prohibition on competitors commenting on pricing practices and rejected claims of free speech infringement. An antitrust court may fashion any necessary remedy to avoid recurrence of the violation and eliminate the consequences of the illegal activity. It may "curtail the exercise of liberties that the society might otherwise enjoy," while not offending Constitutional protections, because anticipative speech is unethical and not protected speech. [Id. at 697]

In Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622 (1994), the court upheld the regulation of free speech in the television industry to promote fair competition despite claims of first amendment infringements. The Court stated "the Government's interest in eliminating restraints on fair competition is always substantial, even when the individuals or entities subject to the particular regulation are engaged in expressive activity protected by the First Amendment. [Id. at 672; (Stevens, J., concurring in part and concurring in the judgment)]

The Supreme Court has held that antitrust laws may be applied without hesitation to industries that deal in speech and to cases that remedy necessary limits on speech where the harm is an anticompetitive use of speech to achieve illegitimate economic harm. [Cohen v. Cowles Media Co., 501 U.S. 663, 670 (1991)("Generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental affects on its ability to gather and report the news."); Barnes v. Glen theater, Inc., 501 U.S. 560, 566-67

(1991); <u>Citizen Publishing Co. v. United States</u>, 3954 U.S. 131, 139-40

(1969)(impact on newspapers from general application of antitrust laws is far

outweighed by positive application of antitrust enforcement)]

In <u>United States v. Phillip Morris USA, Inc.</u>, 566 F.3d 1095 (D.C. Cir.

2009), <u>cert. denied</u>, 130 S.Ct. 3501 (2010), the United States brought action

alleging that cigarette manufacturers and tobacco-related trade organizations

violated RICO by engaging in conspiracy to deceive the American public about

health effects of smoking and environmental tobacco smoke through false and

misleading public statements and advertisements.  The District Court entered

judgment in government's favor.  The Court of Appeals affirmed and reversed in

part, finding Defendants engaged in mail and wire fraud, and their statements

regarding health effects of smoking were not protected by the First Amendment.

[<u>Id</u>. at 1123]  Their statements were misleading as to smoking's health effects and

fraudulent when they denied adverse health effects of secondhand smoke. [<u>Id</u>.]

The First Amendment does not protect fraud.  <u>Id</u>.  The Court held that while

Defendants' public statements were inextricably interwoven with protected speech,

the economic motivation and misleading speech permitted RICO regulation. [<u>Id</u>. at

1124]

The substantive evil of Defendants' "infomercials" sponsored by 1 800 GET

THIN's competitors is to promote themselves with false and misleading attacks on

1 800 GET THIN as part of a "protection" scheme Defendants Times operates

where they charge a "premium" to these advertisers to immunize them from

similar attacks.  Pay or get attacked is what the scheme is about, and because 1 800

GET THIN will not pay, it has been attacked with false and misleading accusations

such as the clinics associated with it will lose their JACHO accreditation because

of four (4) violations, where Defendants' advertisers have 11, 12, 14, and 30

violations and not one word about their violations are ever printed in the Times.

The reason for their "immunity" is that they pay "protection" to Defendants, and

1    Defendants have used the first amendment as an anticompetitive sham to exact

2    advertising fees in a Chicago Style "protection" scheme.

3             **3. Defendants have overstepped First Amendment protections.**

4             Defendants argue the Complaint charges them with refusing to allow 1 800

5    GET THIN to advertise in its newspaper or on its website, and that it has a right to

6    refuse service to 1 800 GET THIN. (Defendants' Memo, p. 10, lines 6-12)

7    However, that is not what the Complaint alleges. Rather, the Complaint alleges

8    Defendants initially "boycotted" 1 800 GET THIN and engaged in a concerted

9    anticipative refusal to deal. Afterward, Defendants engaged in a concerted effort

10   to charge 1 800 GET THIN "protection" money at 2 ½ to 3 times its prior

11   advertising rate. (Complaint, pp. 15-16). The anticompetitive conduct enforces the

12   Chicago Style "protection "scheme by punishing advertisers, such as 1 800 GET

13   THIN, for not paying "protection" money for "immunity" from attack.

14           Defendants cite Newspaper Printing Corp. v. Galbreath, 580 S.W.2d 777

15   (Tenn.), cert. denied, 444 U.S. 870 (1979), for the proposition a newspaper is not

16   required to accept for publications any advertisement. (Defendants' Memo, p. 10,

17   lines 12-15) The regulation of advertising is not at issue. The Court in Galbreath

18   found that the paper could regulate form and formatting. This is not about form

19   and formatting. This case is about using attack advertising to generate advertising

20   in a pay for protection scheme.

21           Defendants' actions were designed to restrain trade and competition by

22   collecting advertising premiums from 1 800 GET THIN's competitors to promote

23   the anticipative attack on 1 800 GET THIN. Defendants' actions have nothing to

24   do with setting advertising formats.

25           Defendants cite Miami Herald Pub. Co. v. Tornillo, 418 U.S. 241 (1974), for

26   the proposition a newspaper can make its own choice of material to go into its

27   newspaper, and its exercise of editorial control is protected by the First

28   Amendment. (Defendants' Memo, p. 11, lines 3-11) However, in Tornillo the

Court struck down a Florida statute which required the newspaper to permit a political candidate to respond to personal attacks. The <u>Tornillo</u> case has nothing to do with 1 800 GET THIN's case, and a more analogous situation would be if a newspaper accepted advertising from a political candidate as a "premium" for endorsing the candidate and then attacking the candidate's competition with false "infomercial" and "advertorial" accusations. Such a scheme is unlawful.

### 4. 1 800 GET THIN's Complaint meets all pleading standards.

Defendants claim 1 800 GET THIN has not met the heightened pleading requirements of <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007). (Defendants' Memo, p. 13, lines 7-18)  However, 1 800 GET THIN's Complaint alleges the time, date, place, persons involved, and Defendants' actions which demonstrate the Sherman Act, Lanham Act, and RICO violations.  The Complaint contains the date of each article, its author, the identify of the advertisers, including copies of the advertisements, the facts which demonstrate Defendants' Chicago Style "protection" scheme, Defendants' receipt of "premiums" through its division called LA Links, and its enforcement of the "protection" scheme with a boycott against 1 800 GET THIN and demand for "premiums" of 2 ½ to 3 times normal advertising rates from 1 800 GET THIN to be allowed to advertise with Defendants. [Attached as Exhibit "A" is a summary of the Complaint's allegations which demonstrate the detailed, specific, and satisfaction of all heightened pleadings details of time, date, place, and identity]  Defendants do not mention one fact, not one event, or any of the allegations which disputes the allegations contained in the proposed SAC.

While there are no heightened pleading requirements under the Lanham Act 1 800 GET THIN has made a detailed pleading which meets all heightened pleading requirements.  [<u>Coastal Abstract Serv., Inc. V. First Am. Title Co.</u>, 173 F.3d 725, 735 (9th Cir. 1999)(There is no heightened pleading or proof standard for trade libel.)]  Nevertheless, all of 1 800 GET THIN's allegations are supported

Reply - Motion to file Second
Amended Complaint

1    with the specific details which demonstrate how Defendants conducted their

2    Chicago Style "protection" scheme and how they charged advertisers "premiums"

3    for "immunity" and to attack 1 800 GET THIN.

4                    **5. 1800 GET THIN alleges injury to competition.**

5            Defendants claim 1 800 GET THIN cannot show the prerequisite of injury

6    required in making a Sherman Act claim. (Defendants' Memo, p. 15, lines 4-9)

7    However, 1 800 GET THIN alleges the very injuries the antitrust laws were

8    designed to prevent because it lost business, experienced injury to its reputation,

9    lost clients and advertisers, lost investors and financing, and lost personnel who

10   quit because of Defendants' false and misleading attacks. (Complaint, p. 3, lines 4-

11   10)  These damages are injuries in fact to its business and property. [American Ad

12   Mgmt., Inc. v. General Tel. Co., 190 F.3d 1051, 1055 (9th Cir. 1999)]  The

13   damages are of the type the antitrust laws were intended to prevent. [Atlantic

14   Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990)]  It is not necessary

15   for 1 800 GET THIN to detail the amount of injury or specifics of how the injury

16   occurred so long as the injury was caused by Defendants' anticompetitive conduct.

17   [Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114 n. 9 (1969)]

18           1 800 GET THIN's Complaint alleges its injuries are the product of an

19   injury to competition. [Cost Management Servs., Inc. V. Washington Natural Gas

20   co., 99 F.3d 937, 950-51 (9th Cir. 1996)(allegation of harm resulting from

21   anticompetitive conduct is all that is required); Boerstler v. American Medical

22   Ass'n, 16 F.R.D. 437, 444 (N.D. Ill 1954)(complaint need only show the facts of

23   injury and not other details)]  Plaintiff must only allege it has suffered an injury

24   different from other members of the community which results from Defendants'

25   anticompetitive conduct. [Newman v. Universal Pictures, 813 F.3d 1519, 1522 (9th

26   Cir. 1987), cert. denied, 486 U.S. 1059 (1988)("need only allege sufficient facts

27   from which the court can discern the elements of an injury resulting from an act

28   forbidden by the antitrust laws.")]  While antitrust cases now require heightened

CV11-0505-ODW (Ex)                    -- 17 --          Reply - Motion to file Second
                                                        Amended Complaint

pleading standards, there is no heightened pleading standard in alleging antitrust injury. [Leatherman v. Terrant City Narcotics Intelligence & Coordination Unit, 507 U.D. 163, 168 (1993)]

### 6. 1 800 GET THIN has properly alleged the relevant market.

Defendants claim 1 800 GET THIN has not defined the relevant market where Defendants' anticompetitive conduct restrains trade. (Defendants; Memo, p. 16, line 21)  However, the relevant market for 1 800 GET THIN's bariatric surgery and its advertising services is Southern California because that is where it places its advertisements, where its clients are located, where Defendants are located, and where virtually all of Defendants' anti-competitive advertisers are also located. (Complaint, pp. 29-30)  The term "relevant market" encompasses geography and product description to the "area of effective competition" where consumers can turn for alternative sources of supply. [Oltzv. St. Peter's Community Hosp., 861 F.2d 1440, 1446 (9th Cir. 1988)]  1 800 GET THIN has properly defined the relevant market and alleged that competition in that market was affected because Defendants' "protection" scheme which operates in that market for the purpose of attacking 1800 GET THIN in that market. [Times-Picayune Pub. Co., 345 U.S. 594, 881-82 (1953)(relevant market cannot be measured by metes and bounds, but adequately defined by competitive reach of restraint of trade)]

Defendants claim "The only alleged market-related injury is that The Times purported 'conspiracy' to publish negative articles raised the barrier to entry in the weight-loss surgery market." (Defendants' Memo, p. 15, lines 15-18)  However, Defendants misstate the "market" definition which the Complaint identifies as "weight loss surgery and its advertising services" (Complaint, p. 29, lines 8-9), as if it were a "damage" allegation.  Defendants ignore the plain allegations of the Complaint which allege Defendants' "targeting of disfavored businesses which do not advertise with then excludes competition by unreasonable and anti-competitive means" and "restricts the ability of disfavored businesses such as 1 800 GET THIN

1   to compete in the market place, while providing favored advertisers with a

2   competitive advantage which destroys free competition." (Complaint, p. 29, lines

3   21-27) The Chicago Style "protection" scheme has injured competition, mislead

4   consumers as to 1 800 GET THIN's products and services, deterred development

5   of competition, and exacted tribute from advertisers to divert attention from their

6   poor quality of services at cost of a competitive injury to 1 800 GET THIN.

7   (Complaint p. 30, lines 9-25) The effect on competition caused 1 800 GET THIN

8   to lose customers, business, personnel, and clients. (Complaint, p. 30, lines 1-7)

9       Defendants cite <u>Tanaka v. University of Southern California</u>, 252 F.3d 1059

10  (9th Cir. 2001), for the proposition an antitrust plaintiff must allege that a restraint

11  of trade produces an anticompetitive effect in a relevant market." (Defendants'

12  Memo, p. 16, lines 23-26) However, in <u>Tanaka</u>, a USC women's soccer player

13  brought an antitrust claim against the university alleging the PAC-10 Conference

14  rule which required her to give USC two (2) years of attendance before she could

15  transfer to UCLA wasn't a restraint of trade because she wished to transfer after

16  her first year.  The District Court dismissed the complaint, and the Ninth Circuit

17  affirmed, finding the rule discouraged student-athletes from intra-conference

18  transfers for academic reasons and did not have significant anticompetitive effects

19  within a relevant market for purposes of Sherman Act. [<u>Id</u>. at 1062-63] The rule

20  was noncommercial, and was not unreasonable. [<u>Id</u>. at 1063] Plaintiff alleged no

21  effect of the rule because she failed to allege Los Angeles was an "area of effective

22  competition for student-athletes competing in women's intercollegiate soccer

23  programs" given the fact competition was nationwide. [<u>Id</u>. at 1063-64]

24      Defendants claim 1 800 GET THIN has not alleged Defendants' market

25  power. (Defendants' Memo, p. 17, lines 10-11) However, 1 800 GET THIN has

26  alleged Defendants have sufficient market power to actually affect competition,

27  create an unreasonable restraint of trade, injure consumers, and injure 1 800 GET

28  THIN by creating a "protection" scheme in Southern California among bariatric

CV11-0505-ODW (Ex)                    -- 19 --            Reply - Motion to file Second
                                                         Amended Complaint

service advertisers and providers. (Complaint, pp. 29-30)(because of Defendants' "dominant" position in the market, their anticompetitive scheme determines the financial success of businesses in the market).

Defendants claim that surgery centers who advertise their own services are not 1 800 GET THIN's competitors because 1 800 GET THIN is not a surgery center. (Defendants' Memo, p. 17, lines 15-19)  However, any business who advertises a surgery service is competitive with 1 800 GET THIN.  Defendants do it, the group of advertisers who pay Defendants "protection" do it, and any doctor who advertises his bariatric surgery services is competitive with 1 800 GET THIN. Defendants' claim is without merit.

### 7. The Complaint alleges injures to competition

Defendants claim 1 800 GET THIN cannot bring an antitrust claim based on alleged injuries to a single competitor and not to competition.  (Defendants' Memo, p. 18, lines 11-12)  However, the Complaint alleges injuries to competition and to each individual participant in Defendants' Chicago protection scheme. (Complaint, p. 9, lines 15-17)  The combination included both willing and unwilling competitors subjected to an extortion scheme where either they pay Defendants' "premium" or they are subjected to the same false and misleading attacks which Defendants made on 1 800 GET THIN.  (Complaint, pp. 6-8)

The Complaint alleges numerous victims of Defendants' Chicago Style protection scheme who were attacked for not paying "protection," including:

(1)  TopSurgeons Weight Loss Center (Complaint, p. 13, lines 16-17; p.13, line 23; p. 20, lines 10-11; p. 22, line 7; p. 27, line 8; 53, lines 4-11);

(2)  Beverly Hills Surgery Center (Complaint, p. 14, line 1; p. 18, line 20; p. 22, line 7; p. 33, line 17; p. 48, line 17; p. 48, line 27; p. 61, line 12; p. 67, line 5);

(3)  New Life Surgery Center (Complaint, p. 8, line 24; p. 62, line 3);

(4)  Almont Surgery Center ( Complaint, p. 21, lines 3-14); p. 48, line 27; p. 65, lines 3-4);

Reply - Motion to file Second
Amended Complaint

(5) Julian Omidi (Complaint, p. 52, line 17 to p. 53, line 3; p. 54, line 25, to p. 55, line 5)

(6) Michael Omidi (Complaint, p. 52, line 17 to p. 53, line 3; p. 54, line 25, to p. 55, line 5);

(7) Dr. Atul Madan (Complaint, p. 13, line 27; p. 14, line 4; p. 14, line 18);

(8) Dr. Farid Zarif (Complaint, p. 33, line 16; p. 33, line 24; p. 61, line 11; p. 61, line 19).

Defendants cite <u>Brunswick Co. v. Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. 447 (1977), for the proposition the antitrust laws protect competition, not competitors. (Dependants' Memo, p. 18, lines 13-14) However, 1 800 GET THIN's Complaint alleges a Chicago Style "protection" scheme against competition, not just 1 800 GET THIN. Each unwilling or coerced participant is faced with the extortion of either paying the "premium" Defendants force upon them or being subjected to the false and misleading attacks 1 800 GET THIN is forced to incur.

**B. 1 800 GET THIN has properly alleged a Lanham Act violation.**

Defendants claim that 1 800 GET THIN's Amended Complaint is an "untimely sur-reply" to its Motion to Dismiss the Lanham Act claim. (Defendants' Memo, p. 14, lines 17-18). However, Defendants' argument defies explanation, and the existence of new false and misleading articles that enforce Defendants' "infomercial" advertising "protection" scheme. Defendants do not make any substantive arguments regarding the Lanham Act in their Opposition.

Defendants claim "Plaintiff's request to amend its Lanham Act claims is too late, too late, and should be rejected." (Defendants' Memo, p. 24, lines 20-21) However, not only do Defendants fail to explain where there is any "lateness" at all in this case, but also fail to address a single allegation in the Lanham Act claim. It is as if Defendants' don't care what the facts are because the facts are damning, and the only way to respond is for Defendants to hurl "vituperative" at the Complaint in the hopes that "facts" mean nothing, which is not the case.

There is no First Amendment protection from Defendants' conduct because immoral, scandalous, or fraudulent matters are not protected under trademark law and may be regulated by the laws against false advertising. [In re Mavety Media Group, Ltd., 33 F.3d 1367, 1374 (Fed. Cir. 1994)]  Speech regarding trade marks and trade names is not entitled to First Amendment protection because trade names do not convey any commercial information of the kind considered to be protected speech. [Friedman v. Rogers, 440 U.S. 1, 9, 12 (1979)(false speech enjoys no constitutional protection)]  Speech regarding a trademark or trade name is not entitled to First Amendment protection where "there is a significant possibility that trade names will be used to mislead the public." [Id. at 12; Virginia Pharmacy Board v. Virginia Citizens Consumer Council, 425 U. S. 748, 761 (1976)]

The First Amendment is not a shield to trademark disparagement or false advertising because "misleading commercial speech can be redistricted. [E. & J. Gallo Winery v. Gallo Cattle co., 967 f.2d 1280, 1297 (9th Cir. 1992)] The first amendment does not protect misleading or false statements about trademark. [Dr. Seuss Enterprises, L.P. v. Penguin Books USA, 109 F.3d 1394, 1403 n. 11 (9th Cir. 1997)(misuse of plaintiff's trademark "Cat in the Hat" for a parity of the O.J. Simpson Trial "Cat Not In The Hat" was not protected first amendment speech)]

**C.  1 800 GET THIN has Properly Stated a Claim under RICO**

**1. The Complaint alleges wire fraud, mail fraud, and extortion.**

Defendants argue that the Complaint does not support a RICO claim. (Defendants' Memo, p. 2, lines 17-18)  However, Defendants do not address a single factual allegation of the Complaint, and they have no answer to the fact they charge "premiums" to 1 800 GET THIN's competitors to join in the "attack" "advertorials" against 1 800 GET THIN, while concealing far worse conduct by their advertisers.  Defendants cannot deny that 1 800 GET THIN's competitors appear on each "advertorial" and that Defendants are running a sponsored

"infomercial" from competitors to attack competition.  No amount of calling the
Complaint "convoluted" changes these facts.  (Defendants' Memo, p. 2, line 18)

Defendants cite <u>National Organization for Women, Inc. v. Scheidler</u>, 510
U.S. 249 (1994), for the proposition that harassing RICO suits which deter
protected advocacy are barred by the First Amendment.  (Defendants' Memo, p. 9,
lines 9-15)  However, in <u>Scheidler</u>, the Court upheld the RICO complaint because
it alleged a pattern of extortionate activities despite Defendants' claims they were
engaged in First Amendment activities of protesting abortion. [<u>Id</u>. at 256-57]
Where there is a pattern of racketeering activity with the requisite predicate acts of
extortion alleged the statutory requirements are satisfied. [<u>Id</u>. at 256-62]  1 800
GET THIN has alleged a pattern of Defendants' wire fraud telephone calls
accusing it of criminal activities, mail fraud of delivering false "advertorials" and
"infomercials," and extortion" in running a Chicago Style "protection" scheme.

### 2.  1 800 GET THIN has alleged a RICO the "enterprise."

Defendants argue 1 800 GET THIN's Complaint fails to meet the
"enterprise" pleading requirements for a RICO claim because Defendants have not
"associated with anyone for a common purpose of engaging in a course of illegal
conduct."  (Defendants' Memo, p. 21, lines 14-16)  However, Defendants LA
Times Communications, LA Times Newspapers, and LA Times International have
associated to extort 20 businesses who are competitors to 1800 GET THIN to
extort them into paying premiums for protection and immunity from attack.
(Complaint, pp. 21-23).

RICO prohibits any person from acquiring an interest in or control of any
enterprise through racketeering activity. [<u>Seville Indus. Machinery Corp. v.
Southmost Machinery Corp.</u>, 742 F.2f 786, 788 (3d Cir. 1984)]  The "enterprise"
requires the existence of conduct which gains control of an enterprise through a
pattern of racketeering. [<u>Sedima, S.P.R.L. v. Imrex Co.</u>, 473 U.S. 479, 496 (1985)]
Under RICO, an enterprise exists when (1) there is an "ongoing organization,

1   formal or informal" (2) with members functioning as a "continuing unit" with

2   established duties; (3) which is "separate and apart" from the pattern of activity in

3   which it engages. [United States v. Turkette, 452 U.S. 576, 583 (1981)]

4   1 800 GET THIN has alleged Defendants formed a Chicago Style protection

5   scheme with 20 different advertisers who voluntarily or involuntarily were extorted

6   into paying protection through advertising premiums to Defendants for the purpose

7   of attacking competition, including 1 800 GET THIN, by false and misleading

8   sponsored "infomercials" and advertorials.  The enterprise members purchase

9   immunity from such attacks.  The group is separate and apart from the pattern of

10  activity and it constitutes a on going enterprise to restrain trade.

### 3.  1 800 GET THIN has alleged a pattern of racketeering

12  Defendants claim 1 800 GET THIN has not alleged a racketeering activity.

13  (Defendants' Memo, p. 23, lines 6-7)   However, 1 800 GET THIN has alleged

14  Defendants engage in a pattern of wire fraud through the use of LA Times

15  Newspapers and LA Times International who knowingly distribute advertisements

16  which LA Links extorts form the advertisers, and Defendants knowingly distribute

17  the false and misleading statements which are designed to punish competitors, such

18  as 1 800 GET THIN, should they fail to pay the extorted "protection" payments.

19  The pattern of racketeering has existed since 1999, when Defendants instituted a

20  policy of "advertorials" to open the Staples Center, and it has continued through

21  repeated false, misleading, and extortionate attacks against competitors who

22  sponsor the attack "infomercials" and "advertorials" (Complaint, pp. 60-70)

23  A pattern of racketeering activities is alleged when "the racketeering

24  predicates are related, and that they amount to or pose a threat of continued

25  criminal activity. [H.J., Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229,

26  239 (1989)]  "To establish continuity, plaintiffs must prove ... either a closed

27  period of repeated conduct, or an open-ended period of conduct that 'by its nature

28  projects into the future with a threat of repetition." [World of Faith World

Outreach Center Church v. Sawyer, 9 F.3d 118, 122 (5th Cir. 1996)]  Fraud as part
of a pattern of racketeering is demonstrated where there is reliance by plaintiff or
those involved, voluntarily or involuntarily, in the activity is demonstrated.
[Summit Properties, Inc. v. Hoechst Celanese Corp., 214 F.3d 556, 562 (5th Cir.
2000)]

As part of the enterprise Defendants Hiltzik and Pfeifer attacked any
individual or business who would not pay the protection, including TopSurgeons,
Almont Surgery Centers, New Life Surgery Centers, Beverly Hills Surgery
Centers, Dr. Zarif, and several individuals identified above (see pp. 20-21, supra).
These individuals acting within the scope of their duties serve as the RICO person
and their employer corporations are the RICO enterprise, along with the group of
advertisers who have joined the enterprise. [Cedrick Kushner Promotions, Ltd., v.
King, 533 U.S. 158, 1612 (2001)]  Defendants Hiltzik and Pfeifer are the enforcers
of the extortionate "protection" scheme and they have active duties to maintain the
enterprise through their racketeering pattern of "sock-puppeting" and removing
favorable comments to 1 800 GET THIN from Defendants' website. (Complaint,
pp. 18-19, 25-26, 60-61 & 64-65)

**IV.**

**CONCLUSION**

For the foregoing reasons, Plaintiff 1 800 GET THIN, LLC, requests it's
Motion for Leave to File Second Amended Complaint be granted.

Dated: July 18, 2011                    **SILVERMAN & ASSOCIATES**

Robert B. Silverman
Attorneys For Plaintiff

Exhibit "A"

EXHIBIT "A"

## SUMMARY OF TIME, DATE, PLACE, AND IDENTITY DETAILS OF 1 800 GET THIN'S COMPLAINT

The following is a summary of the time, date, place, and identity details of 1 800 GET THIN's Complaint against defendants Times which satisfy all heightened pleading requirements and disclose the names and conduct of defendants to run their Chicago Style "protection" scheme with 1 800 GET THIN's competitors in by anticipative false attacks against 1 800 GET THIN (Complaint, pp. 8-23; pp. 34-36, & pp. 59-70).

The complaint alleges that on May 3, 2011, defendant Pfeiffer published an article in which he attacked 1 800 GET THIN for having a surgery center with four (4) Joint Commission on accreditation violations while his sponsors, which were identified by name, had 11, 12, 14, and 30 violations which he concealed because they had paid advertising "protection" fees to get immunity form attack. (Complaint, pp. 8-10.

The Complaint alleges that on May 26, 2011, Sharona Espudo died from complications of surgery at defendants' advertiser Angeles Hospital in Tijuana, Mexico, but that defendants did not publish or mention the death, while at the same times their articles of May 3, 2011, accused 1 800 GET THIN of having deaths at its associated surgical facilities, because Angeles Hospital was a Times advertiser who had paid "protection" fees to get immunity form attack (Complaint pp. 11-12).

The complaint alleges that on December 19, 2010 defendant Hiltzik published an article accusing 1 800 GET THIN of being involved of patient Ana Renteria despite the fact 1 800 GET THIN is an advertising company, and that the article was sponsored by competitor advertisers who were identified by name and who paid "premiums" for "immunity for attack from similar false and misleading claims against them (Complaint, pp. 12-13).

The Complaint alleges that on December 19, 2010, defendants falsely accused 1 800 GET THIN's associated Doctor, Atul Madan, of being responsible for Ana Renteria's death, while the concealed that their advertiser, LapBand.com,

also advertised for Dr. Madan, and that defendants concealed the association of Dr. Madan to LapBand.com because LapBand.com had paid the advertising fee "premium" to defendants for "immunity" from such attacks while 12 800 GET THIN refused (Complaint, pp. 13-14).

The Complaint alleged that on April 26, 2010, defendants Editorial Department instructed its Advertising Department to refuse advertisements form 1 800 GET THIN which constituted a concerted refusal to deal with 1 800 GET THIN because to prevent it from responding to defendants' attacks (the e-mail was attached as Exhibit "E" from Lori Johnson showing the time, date, and names of the defendants involved), and that on September 29, 2010, defendant's employee Lorie King notified 1 800 GET THIN that if it would pay a premium of 2 ½ to 2 times the normal advertising rate 1 800 GET THIN could advertise with defendants, which was part of defendants anticompetitive "protection" scheme to grant immunity to 1 800 GET THIN if it paid "protection." (Complaint, pp. 15-16).

The Complaint alleges that after 1 800 GET THIN brought to the Court's attention defendants' sanitizing the advertisements from the Court filings, defendants removed the block on 1 800 GET THIN's advertising as an admission the blocking was intentional and part of defendants concerted activities to restrain trade (Complaint, pp. 17-18).

The complaint alleged that defendants had a long history of selling editorial content since 1999, when defendants had done the very same thing before with advertisers AEG Live, LLC, to launch the opening of Staples Center in Los Angeles, California (Complaint, p-p. 17-18).

The Complaint alleged that on June 11, 2011, defendants published an article form defendant Pfeiffer attacking 1 800 GET THIN because patients had allegedly died form surgical complications at one of its advertisers clinics while at the same time concealing Sharona Espudo's death from complications at its advertiser Angeles Hospital facility, and that when bloggers began making comments favorable to 1 800 GET THIN defendants' deleted and censored the favorable comments by removing them from its website to enforce its anticompetitive protection scheme to attack 1 800 GET THIN for its advertisers who pay "premiums" to defendants for such attacks. (Complaint, pp. 18-19).

The Complaint alleges on February 14, 2010, defendant Hiltzik published an article which he falsely stated 1 800 GET THIN engaged in false advertising that the Lap Band procedure takes an hour when it actually takes 3 to 4 hours, and that it was responsible for the improper conduct of doctors at one of its advertiser clinics as part of the Chicago Style protection sachem to falsely state that if the public goes to its advertisers they are "Highest Rated, "Experts," and "Effective," where if the public patronizes 1 800 GET THIN the public faces injury and harm (Complaint, pp. 19-20).

The Complaint alleges that on March 4, 2010, defendant Hiltzik published an article falsely stating 1 800 GET THIN was responsible for the problems at one of the clinics who advertised with 1 800 GET THIN, while concealing the same problems which defendants Times own advertisers experience, claiming those same advertisers were "Leading Surgeons," "Highest Rated," and "Experts," and concealing its advertiser LapBand.com was associated with the same clinic for which it accused 1 800 GET THIN of being associated (Complaint, pp. 21-22).

The Complaint alleges that on April 18, 2010, defendant Hiltzik published an article sponsored by the same group 1 800 GET THIN'S competitors stating patient Willie Brooks died from surgery associated with 1 800 GET THIN and falsely stating that he was referred despite the fact he was 6 foot 6 inches tall and weighed 300 pounds, which was outside guidelines for bariatric surgery, in order to make it appear 1 800 GET THIN was engaged in insurance fraud and medical incompetence, when the truth was Brooks was 5'6" tall and well within guidelines. (Complaint pp. 22-23).

The complaint alleged defendants engaged in "Sock-Puppeting" to make adverse comments on its website from "fake" and "shill" bloggers who were actual defendant Hiltzik to falsely accuse 1 800 GET THIN of criminal conduct as part of its Chicago Style protection scheme. (Complaint, pp. 24-25).

The Complaint alleges that on February 26, 2010, defendant Hiltzik telephone Dr. Farid Zarif, who worked at one of 1 800 GET THIN's advertising clients and falsely told him that he and 1 800 GET THIN were breaking federal law and committing a crime because he clinic's license had been revoked as part of defendants Chicago Style protection scheme to injure competition for the benefit of 1 800 GET THIN's competitors who pay "premiums" to defendants to attack and injury their competitor, 1 800 GET THIN. (Complaint, p. 33-34).

The Complaint alleges that on December 19, 2011, defendant Hiltzik published an article concealing that Dr. Jonathan Fielding, who accused 1 800 GET THIN of false advertising, was a consultant for Johnson & Johnson, an advertising competitor for the Realize Band which competes with 1 800 GET THIN's LapBand, and then on January 23, 2011, of publishing an article falsely denying the existence of the conflicts of interest as a product of its anticompetitive scheme to attack 1 800 GET THIN for defendants' advertisers and masquerading news reporting for the sponsored "infomercial" and "advertorials" it actually was publishing.  (Complaint, pp. 35,-36).

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on all counsel of record herein via the Court's electronic notification system on July 18, 2011.


/s/ Robert B. Silverman